THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. FIDEL NINO, Defendant-Appellant.

Third District    No. 3—94—0678

Opinion filed April 30, 1996.—Rehearing denied June 5, 1996.

HOLDRIDGE, P.J., concurring in part and dissenting in part.

Edward A. Burmila, Jr. (argued), of Burmila & Thomas, P.C., of Joliet, for appellant.

James Glasgow, State's Attorney, of Joliet (John X. Breslin and Gary F. Gnidovec (argued), both of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE McCUSKEY delivered the opinion of the court:

Following a jury trial with eight other defendants, Fidel Nino (the defendant) was convicted of first degree murder (720 ILCS 5/9—1(b)(6) (West 1994)), aggravated arson (720 ILCS 5/20—1.1(a)(1) (West

1994)), and aggravated discharge of a firearm (720 ILCS 5/24—1.2(a)(1) (West 1994)). The defendant received concurrent sentences in the Department of Corrections of 75 years, 50 years, and 15 years, respectively.

On appeal, the defendant contends: (1) he was not proven guilty beyond a reasonable doubt; (2) he was denied his statutory right to a speedy trial; (3) the State misled the jury concerning its dealings with a material witness, Victor Aldava (Aldava); (4) the prosecutor improperly commented on his right to remain silent; (5) he was denied a fair trial by the prosecutor's improper closing argument; (6) the prosecutor improperly introduced evidence of other crimes; (7) the trial court improperly relied on inadmissible evidence to give him an extended sentence; and (8) his sentence is grossly disproportionate to those of his codefendants.

Following our careful review of the record, we determine the evidence was sufficient to prove the defendant guilty beyond a reasonable doubt. We also find no violation of the defendant's speedy trial rights. However, we conclude that the State engaged in improper conduct by: (1) misleading the jury regarding its dealings with Aldava; (2) commenting on the defendant's right to remain silent; (3) misleading the jury with improper closing argument; and (4) introducing evidence of other crimes. The cumulative impact of this conduct fundamentally flawed the defendant's trial. As a consequence, the defendant is entitled to a new trial. Because the cause is being remanded for a new trial, we will not address the questions regarding sentencing.

## I. Background

On November 21, 1993, several members of the Latin Kings street gang firebombed and shot into a house on the east side of Joliet. Aldava and his bedridden grandmother, Nicolosa Esquivel, were the only people in the house. After the firebombing, Aldava tried unsuccessfully to save his grandmother's life. She died from smoke inhalation.

Danny Martinez testified that on the day of the crimes, several members of the Latin Kings met twice at his house. The defendant and Anthony Montoya held leadership positions in the Joliet area street gang. The first meeting occurred at approximately 1 p.m. Danny's live-in girlfriend, Angelina Borrego (Angelina), testified that, at Danny's request, she was out of the house before the meeting started. However, before she left, Angelina saw the defendant and Montoya arrive at the house.

Danny testified that, at the meeting, Michael Martinez (Michael)

sold the street gang a stolen 9 millimeter handgun. Danny testified that Juan Woodward, Mario and Freddie Gonzalez, and Jessie Pena told the defendant they had been subjected to an armed attack by Jose Aldava, a rival Vice Lords gang member who lived with his brother, Victor.

Following this revelation, the defendant, Montoya, and Danny (a "staff member" of the Latin King's leadership) held a small meeting to decide what to do about Jose Aldava. The defendant then told Woodward, the Gonzalezes, and Pena "to burn down" the Aldava residence. Before the meeting adjourned, the defendant and Montoya instructed all of the gang members to return to Danny's house later that evening for another meeting.

Danny testified that, at approximately 5 p.m., various Latin Kings began arriving at his home. Angelina was present, but went into a bedroom before the meeting began and did not see the gang members arrive. Danny said that he showed Woodward how to use the 9 millimeter handgun and gave a shotgun to Freddie Gonzalez. The defendant instructed a group of Latin Kings to attract the police to a nearby street by throwing rocks at cars. Danny helped construct firebombs out of 40-ounce beer bottles, rags, and gasoline. Pena and Mario Gonzalez were told to break the window of the Aldava residence to allow the entry of the firebombs. After the second meeting, Angelina testified that Danny asked her if she wanted to go to a Pizza Hut with the defendant and Montoya. She refused and saw the defendant and Montoya leave the meeting with their girlfriends.

Danny testified that after the others left the meeting, he heard gunshots. He identified the sound of the shots as coming from a 9 millimeter handgun. The Latin Kings who were involved in the firebombing returned to Danny's house. At his home, Danny took the 9 millimeter handgun and the shotgun from the gang members. Danny and Angelina then ate dinner.

Aldava testified that he was a member of the Two-Sixers street gang. On November 21, 1993, at around 6:20 p.m., he was looking out his front bay window while talking on the telephone with his girlfriend. Several Latin Kings walked by his front window and displayed gang signs disrespecting the Gangster Disciples and the Two-Sixers. About five minutes later, the Latin Kings returned. Aldava saw Juan Woodward pull a gun from his waist, and Aldava threw himself down on the floor of the home. He heard four gunshots and glass breaking. Aldava then saw two firebombs come through the front window. As he brushed some fire off his clothing, Aldava saw the Latin Kings running away. Aldava tried to carry his grandmother from her room but was unable to accomplish the task. He then ran

next door to get help from his neighbors. Firefighters arrived shortly thereafter.

The jury returned its verdict finding Freddie Gonzalez, Mario Gonzalez, the defendant and Montoya guilty of first degree murder, aggravated arson, and aggravated discharge of a firearm. Eddie Olender and Joe Lopez were found guilty of theft and not guilty of first degree murder. Anthony Morrow, Miguel Orozco and Victor Guzman were found not guilty on all counts. Following sentencing, the defendant filed a timely notice of appeal.

## II. Sufficiency of Proof

The defendant initially claims that he was not proven guilty beyond a reasonable doubt of first degree murder, aggravated arson, and aggravated discharge of a firearm. In this regard, the defendant relies primarily on his contention that Danny and Michael were unbelievable accomplice witnesses who received financial rewards and great leniency from the State in exchange for their testimony.

### A. Applicable Law and Standard of Review

██ The evidence shows that after the second meeting at Danny's house, the defendant and Montoya went to Pizza Hut for dinner and were not present at the crime scene or Danny's house during the rest of the evening. As a consequence, the defendant was charged under an accountability theory. Accountability under the law must be established by evidence which shows the defendant: (1) solicited, aided, abetted, agreed, or attempted the offense; (2) participated before or during the offense; and (3) had a concurrent, specific intent to promote or facilitate the commission of the offense. 720 ILCS 5/5—2 (West 1992); *People v. Houston*, 258 Ill. App. 3d 364, 367-68, 629 N.E.2d 774, 778 (1994).

In addition, the law of accountability provides that when two or more people participate in a criminal plan, any criminal acts committed by one party in furtherance of the plan are considered to be the acts of all of the people involved. *Houston*, 258 Ill. App. 3d at 367-68, 629 N.E.2d at 779. Furthermore, presence at the scene of the crime is not a required element of accomplice liability. A person absent from the scene of the crime can be charged as an accomplice if he or she participated in the plan. *People v. Feagans*, 134 Ill. App. 3d 252, 261, 480 N.E.2d 153, 160 (1985).

In judging the sufficiency of the evidence on appeal, the relevant inquiry is not whether we believe the defendant's guilt was established beyond a reasonable doubt. Rather, the issue is whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of

the crime beyond a reasonable doubt. *People v. Campbell*, 146 Ill. 2d 363, 374, 586 N.E.2d 1261, 1266 (1992); *People v. Collins*, 106 Ill. 2d 237, 261, 478 N.E.2d 267, 277 (1985). After reading the record and viewing the evidence in the light most favorable to the prosecution, we conclude that a rational jury could have found the defendant guilty beyond a reasonable doubt, based on accountability principles.

## B. Aggravated Arson

■ A person commits the offense of arson when he knowingly uses fire or explosives to damage the real or personal property of another having a value of $150 or more. 720 ILCS 5/20—1(a) (West 1994). Aggravated arson is arson committed with the knowledge that a person is present in the building burned or where any person suffers great bodily harm or permanent disability or disfigurement as a result of the fire. 720 ILCS 5/20—1.1 (West 1994). The record contains ample evidence from which a reasonable trier of fact could find: (1) the defendant planned and ordered the knowing use of fire to damage the Aldava residence; (2) the property was valued in excess of $150; and (3) great bodily harm occurred as a result of the arson.

Danny and Michael testified concerning the defendant's direct involvement in planning the arson. Angelina testified that she saw the defendant arrive for the first meeting and leave following the second one. Moreover, the State has proved that the defendant's involvement took place before the offenses occurred. Finally, we conclude that based on the above testimony, there was adequate evidence from which a rational trier of fact could find the defendant possessed the requisite specific intent to promote aggravated arson.

## C. First Degree Murder and Aggravated Discharge of a Firearm

Once the State proves that the defendant had the specific intent to promote a crime, the defendant is then responsible for any criminal act which is committed in furtherance of the crime. *Houston*, 258 Ill. App. 3d at 364, 629 N.E.2d at 779. We determine there is ample evidence in the record to support the jury's finding that the defendant had the specific intent to promote the commission of the offense of aggravated arson. Accordingly, the defendant is legally accountable for the crimes committed in furtherance of the plan. *People v. Dukes*, 263 Ill. App. 3d 765, 770, 635 N.E.2d 732, 735-36 (1994).

## D. Accomplice Testimony

■ In urging this court to reverse his convictions, the defendant argues that the State's key witnesses were unbelievable and did not support his conviction. We do not agree. Uncorroborated accomplice testimony can support a conviction if there is sufficient evidence for

the trier of fact to find the elements of the offense beyond a reasonable doubt. *People v. Holmes*, 141 Ill. 2d 204, 242, 565 N.E.2d 950, 967 (1990).

The defendant is correct that courts cautiously scrutinize accomplice testimony. *Holmes*, 141 Ill. 2d at 242, 565 N.E.2d at 967. Nonetheless, the "inherent weaknesses" of accomplice testimony bear on the weight to be given such evidence, as well as the credibility of the witness. These determinations are matters "peculiarly within the province of the trier of fact." *Holmes*, 141 Ill. 2d at 242, 565 N.E.2d at 967. We will not substitute our judgment for that of the jury on questions concerning the weight of the evidence or the credibility of witnesses. A reviewing court will reverse the trier of fact *only* when the evidence is so improbable, impossible or unsatisfactory that it raises a reasonable doubt as to the defendant's guilt. *People v. Irby*, 237 Ill. App. 3d 38, 58, 602 N.E.2d 1349, 1364 (1992).

■ Danny, Michael, and Angelina were heavily impeached at trial by nine different defense attorneys. The jury heard extensive testimony concerning the incentives and financial benefits the State gave these witnesses in return for their testimony. The record clearly shows that Michael and Danny received immunity from prosecution for their involvement in two separate murder cases. Danny and Angelina received rent-free housing, free groceries, and cash payments prior to and during the defendant's trial. The incentives the State gave these witnesses are factors to be considered by the trier of fact and weighed along with all the other evidence. *Irby*, 237 Ill. App. 3d at 59, 602 N.E.2d at 1365. Despite the heavy impeachment of Danny, Michael, and Angelina, the jury chose to believe their testimony after weighing it along with all the evidence presented during the trial. Following our review, we do not find the evidence to be so improbable, impossible, or unsatisfactory that it raises a reasonable doubt concerning the defendant's guilt.

## III. Speedy Trial

This portion of our opinion is nonpublishable under Supreme Court Rule 23 (166 Ill. 2d R. 23).

## IV. Trial Errors

### A. Misleading the Jury

The defendant argues that the State improperly misled the jury concerning its dealings with Victor Aldava. We agree.

At the time of the defendant's trial, Aldava was in custody charged with residential burglary and arson. If convicted, he faced 4

to 15 years in the Department of Corrections. On the very day that Aldava testified in the defendant's trial, he appeared in court with Assistant State's Attorney Knick, who continued his pending criminal cases. Knick was also a prosecutor in the defendant's case. At the time, the defendant was unaware that Aldava's criminal matters had been continued to a later date. The day after the jury's verdicts were rendered in the defendant's case, Knick appeared in court with Aldava. As a result of plea negotiations, the pending charges against Aldava were dismissed. The State allowed Aldava to plead guilty to burglary and recommended probation. The trial court accepted the negotiated plea and sentenced Aldava to probation.

During his testimony at the defendant's trial, Aldava denied that he had a "deal" with the Will County State's Attorney's office concerning the status and disposition of his pending residential burglary and arson cases. On cross-examination, the following exchange took place between a defense attorney and Aldava:

"Q. [Defense counsel:] You're in custody now charged with residential burglary and arson?

A. [Aldava:] Correct.

Q. And that's a felony, both of those are felonies?

A. Yes.

Q. And you understand if you get convicted of residential burglary you have to go to the pen, right?

A. Yes.

Q. For at least four years?

A. Yes.

Q. And maybe up to 15 years?

A. Yes.

Q. You're kind of hoping the State is going to give you a deal if they haven't already, is that correct?

A. No. They ain't give me no deal.

Q. Are you kind of hoping that they do?

A. Hope, hoping.

Q. Hoping.

A. But I know I'm not going to get it.

Q. You know you're not going to get it?

A. Correct.

Q. Is there a reason why your case has been continued about three times until after you testify in this case before it's disposed of?

A. No.

Q. You have no reason for—to know why it's continued?

A. No.

Q. If you're not going to get a deal, why don't you just set the case for trial or your lawyer set the case for trial?

A. I don't know.

Q. He doesn't tell you why?

A. Nope."

The State presented Aldava to the jury as a witness with no felony convictions, who was voluntarily testifying regarding the tragic death of his grandmother. In fact, Aldava was a witness with a strong motivation to please the State in order to avoid a long sentence in the penitentiary.

Aldava's testimony at a hearing on the defendant's post-trial motion for a new trial shows how he was presented to the jury in a misleading light. Aldava testified that after a witness for the State "left town" the State approached him about testifying in the defendant's case:

"Q. [Defense counsel:] Who was it that talked to you about that?

A. [Aldava:] Some—they just told—they just told, I think, I believe they told a lawyer. I'm not sure, then, how somehow it got to me.

Q. So, somebody went to your lawyer and told your lawyer that he needed you to testify in the case, and then somehow that got to you?

A. Correct.

Q. But you didn't have a deal?

A. No."

Aldava's attorney, James Chesloe, admitted that prior to Aldava's testimony, Chesloe had "preliminary discussions" with Assistant State's Attorney Knick concerning the disposition of Aldava's residential burglary and arson cases. Chesloe testified: "[W]e continued it from time to time, and I had conversations with Mike Knick that eventually when [the defendant's] case was finished we would talk in regards to [Aldava's] case." Chesloe attempted to dispose of Aldava's cases before Aldava testified in the instant case, but Knick would not put anything "on the table." The trial court took judicial notice of the fact that Aldava's cases were disposed of "pursuant to [a] negotiated disposition" the day after the verdicts in the defendant's case.

Assistant State's Attorney Mock testified that "Aldava's disposition had nothing to do with his testimony in this case. *The holding off of his disposition had everything to do with the fact that he couldn't be a convicted felon at the time he testified, which is another form of impeachment.*" (Emphasis added.)

The law is well settled that a prosecutor may not knowingly use, or allow to go uncorrected, perjured testimony which goes to the substance of a witness' testimony or facts which bear on the witness' credibility. *Giglio v. United States,* 405 U.S. 150, 153, 31 L. Ed. 2d

104, 108, 92 S. Ct. 763, 766 (1972); *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959); *People v. Jimerson*, 166 Ill. 2d 211, 223, 652 N.E.2d 278, 284 (1995). Our supreme court has recently resolved a conflict among certain districts of the appellate court, in holding that in order to rise to the level of a constitutional violation, the use of false testimony must be with the State's knowledge. *People v. Brown*, 169 Ill. 2d 94, 103 (1995). While the record is unclear whether Aldava's testimony constitutes perjury, the State clearly presented Aldava to the jury in a misleading light.

■ In the case at hand, the State does *not* dispute that it had knowledge of the misleading character of Aldava's testimony. Indeed, Assistant State's Attorney Mock admitted during the post-trial hearing that the State deliberately manipulated the timing of Aldava's pending cases so that he would have no felony convictions at the time he testified. As a result, Aldava's testimony appeared in a misleading light, and his credibility before the jury was not impeached.

We also disagree with the State's contention that no specific promise of leniency was made to Aldava prior to his testimony. On appeal, we are not required to "suspend common sense in evaluating the evidence in the record." *Jimerson*, 166 Ill. 2d at 227, 652 N.E.2d at 286. Chesloe testified that he had preliminary "conversations" with the assistant State's Attorney and they both had an understanding that "eventually when [the defendant's] case was finished we would talk in regards to [Aldava's]." The record reveals, and common sense dictates, that there was an unspoken understanding between Aldava's attorney and the State. The ultimate resolution of Aldava's case, "pursuant to [a] negotiated disposition," the morning after the verdicts were rendered in the defendant's case, clearly lends substantial support to our conclusion that Chesloe and the assistant State's Attorney had an unspoken agreement. *Jimerson*, 166 Ill. 2d at 227, 652 N.E.2d at 286. The record clearly establishes that the State knowingly manipulated the testimony of Aldava concerning facts which bear directly on his credibility.

We find the manipulation of Aldava very disturbing because his testimony was essential to the State's case against the defendant. Aldava was the *sole* witness to offer proof concerning the charge of aggravated discharge of a firearm. In addition, Aldava provided crucial corroboration of Danny's testimony about how the firebombing was to be carried out. Aldava also corroborated the scientific evidence concerning the use of the weapon and accelerant. As a result, we agree with the defendant's contention that the jury was improperly misled concerning facts directly related to the credibility of a material witness.

## B. Right to Remain Silent

During opening statements to the jury, the assistant State's Attorney commented: "[I]f Danny Martinez wasn't breaking ranks and testifying, there wouldn't be a trial here. None of these defendants would be on trial. There [are] a couple of sayings that you hear in law enforcement *** one of them is nobody talks, everybody walks." The defendant's objection to the comment was overruled, and the prosecutor continued: "[A]nd that's true. If Danny Martinez wasn't talking, we would have no evidence. The [converse] of that is the first to squeal gets the deal." After opening statements, several defense attorneys joined in a motion for a mistrial based on the prosecutor's comments. The trial court denied the motion. Similarly, during closing argument, the prosecutor stated: "[W]hen gang members commit an offense *** they don't talk they walk."

■ A criminal defendant has a constitutional right (see *Griffin v. California*, 380 U.S. 609, 14 L. Ed. 2d 106, 85 S. Ct. 1229 (1965)) and a statutory right (see 725 ILCS 125/6 (West 1994)) to remain silent and not incriminate himself. "[A]ny reference or comment" which is intended to direct the jury's attention to the defendant's failure to avail himself of the legal right to testify violates the defendant's right to remain silent. *People v. Dixon*, 91 Ill. 2d 346, 350, 438 N.E.2d 180, 182-83 (1982).

■ We find the prosecutor's comments in opening statement and closing argument improperly referred to the defendant's post-arrest silence and his right not to testify at trial. The comments in opening statements, coupled with the repeated reference in closing argument, imply that the defendant was following a gang creed in not testifying. By saying that there would be no case against the defendant without Danny's testimony, while at the same time referring to the defendants with the statement "they don't talk they walk," the prosecutor improperly highlighted the fact that Danny chose to testify *and* the defendant did not.

## C. Improper Closing Argument

During closing argument, in an attempt to shore up the credibility of its key witnesses, the prosecution made the following arguments:

> "[Prosecutor]: Second reason, is that Danny Martinez and Michael Martinez, when they—when this trial is over with, they can't live in Joliet anymore because there is a death warrant out for them.
>
> [Defense counsel]: Objection, Judge. There is no testimony to that.
>
> [THE COURT]: Sustained.

[Prosecutor]: Well, the testimony by Angelina Borrego, and by Danny Martinez and by Michael Martinez, is that if you testify against the Latin Kings they will kill you. So, however you want to call it, however you want to think of it, they go out there. And everybody talking all before about getting the death penalty for two murders. Well, they get the death penalty for two murders, they wait 14 or 15 years before they get executed. Here they testify against these guys, they walk out, they get killed immediately.

[Defense counsel]: Objection, Judge. Same objection.

[Defense counsel]: I object as well, Judge. That is absolutely inappropriate comment on Mr. Knick's behalf.

[THE COURT]: Objection sustained.

[Prosecutor]: They can't be Latin Kings anymore. They can't be members of the Latin Kings.

[Defense counsel]: Judge, objection. There is no testimony to that. It's their own self-serving testimony.

[THE COURT]: Overruled.

[Prosecutor]: They can't live in Joliet anymore. They have to get out.

[Defense counsel]: Objection, Judge. You just sustained that objection.

[THE COURT]: Overruled.

[Prosecutor]: They have to get out of Joliet. They can't be Latin Kings."

■ There is no evidence in the record that Danny and Michael would live longer in prison, convicted of murder and sentenced to death, than as free men. There is no evidence in the record that they had to leave Joliet as a result of their testimony in the defendant's case.

Our supreme court has found similar comments improper when the prosecutor commented: " 'every witness that had the guts to point the finger at this defendant, every witness that had the guts to tell the police that this is the guy, has had to leave town.' " *People v. Smith*, 141 Ill. 2d 40, 66, 565 N.E.2d 900, 911 (1990). Like the improper comments in *Smith*, the assistant State's Attorney's improper comments in the defendant's trial may not have so prejudiced the defendant as to warrant reversal, but they compounded the other fundamental flaws permeating this trial. *Smith*, 141 Ill. 2d at 67, 565 N.E.2d at 911.

## D. Evidence of Other Crimes

On direct examination of Danny, Assistant State's Attorney Mock posed the following questions:

"Q. [Mock:] And could you tell the members of the jury what a drive by shooting is and how that occurs?

A. [Danny:] Go in the car, drive by and somebody drives and go shoot at them.

Q. And who do you shoot at?

A. The opposite gangs.

Q. And which gangs would that be for the Latin Kings?

A. Vice Lords, Gangsters and Two-Six.

Q. So none of the other three major gangs in the Joliet area the Latin Kings get along with them?

A. None of them.

Q. And is this the type of activity something that all Latin King members do?

A. Yes.

Q. You're not unique in that respect?

A. What?

Q. You're not individualized in that respect? You weren't the only guy that did it?

A. No."

Defense counsel objected to this line of questioning on the basis that it was an improper introduction of evidence of other crimes committed by each of the defendants. The defendant also moved for a mistrial. The trial court overruled the objection and denied the motion for a mistrial. Also, Angelina testified that all Latin Kings gang members smoke marijuana.

■ The general rule is that evidence of other crimes is not admissible if it is only relevant to establish the defendant's propensity to commit a crime. *People v. Stewart*, 105 Ill. 2d 22, 61, 473 N.E.2d 840, 859 (1984). Such evidence may be admissible if it is relevant to prove other elements, such as *modus operandi*, intent, identity, motive or absence of mistake. *Stewart*, 105 Ill. 2d at 61, 473 N.E.2d at 860. In determining whether other crimes evidence is admissible, the trial court must balance the purpose for which it is offered against the prejudicial effect it may have upon the defendant. *Stewart*, 105 Ill. 2d at 62, 473 N.E.2d at 860.

While the State claims that this testimony was properly admitted to show motive, lack of mistake and intent, the trial court offered no rationale for allowing it into evidence. Evidence of drug use and drive-by shootings was distinct and entirely unrelated to the case at hand. *People v. Paull*, 176 Ill. App. 3d 960, 964, 531 N.E.2d 1008, 1011 (1988). As a result, we conclude that this type of testimony should not have been admitted into evidence.

## V. Conclusion

For the reasons indicated, we find that viewing the evidence in the light most favorable to the prosecution, a rational trier of fact

could have found the defendant guilty beyond a reasonable doubt. In addition, the defendant's right to a speedy trial was not violated. However, the State engaged in several instances of improper conduct by: (1) knowingly manipulating Victor Aldava's testimony; (2) commenting on the defendant's right to remain silent; (3) engaging in improper closing argument; and (4) introducing evidence of other crimes.

We conclude that the cumulative impact of all of the State's improper conduct rendered the defendant's trial fundamentally flawed. *People v. Kidd*, 147 Ill. 2d 510, 544-45, 591 N.E.2d 431, 447 (1992); *Smith*, 141 Ill. 2d at 67, 565 N.E.2d at 911; *People v. Taylor*, 244 Ill. App. 3d 806, 819, 612 N.E.2d 943, 952 (1993). Accordingly, the judgment of the circuit court of Will County is reversed, and the defendant's case is remanded for a new trial.

Reversed and remanded.

SLATER, J., concurs.

PRESIDING JUSTICE HOLDRIDGE, specially concurring in part and dissenting in part:

I agree that the conviction must be reversed and the matter remanded for a new trial because the People: (1) improperly commented on the defendant's right to remain silent; (2) engaged in improper closing argument; and (3) introduced evidence of other crimes. I believe the cumulative impact of these errors warrants a new trial. I write separately because I do not believe the People's handling of Victor Aldava's testimony should be considered as grounds for reversal. I respectfully dissent from that portion of the majority's opinion.

The majority notes that it is well settled that a prosecutor may not knowingly use, or allow to go uncorrected, perjured testimony that goes to the substance of a witness' testimony or facts which bear on the witness' credibility. *Napue v. Illinois*, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1972). It is clear that the knowing use of perjured testimony by the prosecution is a denial of due process and requires that the defendant be granted a new trial. *People v. Jimerson*, 166 Ill. 2d 211, 223 (1995). However, the defendant must prove that the People knowingly used perjured testimony. *People v. Brown*, 169 Ill. 2d at 103; *People v. Bassett*, 56 Ill. 2d 285 (1974).

In the matter *sub judice*, as the majority acknowledged, the defendant did not prove that Aldava's testimony was perjured, nor did

he prove that the People knowingly used false or perjured testimony. I would hold therefore that the defendant's argument that he suffered prejudice must be rejected unless he can present evidence to show that there were promises made to Aldava that the prosecutor knew about but failed to disclose to the jury. I believe that it is unwise to extend to defendants who have failed to meet the burden of proving the knowing use of perjured testimony those protections afforded defendants who have met that burden.

I also note that the facts in this case are very similar to those in *People v. McMillan,* 239 Ill. App. 3d 467 (1993). In *McMillan,* the court held that the defendant had failed to prove the witness against him testified falsely when he stated that he did not have a deal with prosecutors, but merely "hoped" to get a deal after his testimony against the defendant. In rejecting the defendant's argument for a new trial, the court noted:

> "The only evidence to suggest that a deal was made is the records of Johnston's case which indicate that after defendant's trial, the murder charges against Johnston were dropped and he pleaded guilty to a charge of armed robbery. Johnston, the prosecutor, and Johnston's attorney all indicated there were no deals made, no promises of leniency, and that Johnston only hoped to get something. The jury was able to judge the credibility of Johnston and was fully informed of any motive or bias he might have for testifying. The jury was well aware of the leverage the State had over Johnston and that that could have been the basis for his cooperation in this matter. Defendant cannot show that he was prejudiced by any promises of leniency when there is no evidence to suggest that there were any such promises made." (Emphasis omitted.) *McMillan,* 239 Ill. App. 3d at 494.

As in *McMillan,* the defendant in the instant matter failed to prove that Aldava testified falsely when he stated that he did not have a deal of leniency in exchange for his testimony. The jury knew that Aldava was in custody charged with residential burglary and arson. The jury also knew that, if convicted of those charges, Aldava faced 4 to 15 years in prison. The jury likewise knew that Aldava "hoped" to get something and the People could therefore potentially exert some leverage over Aldava. All these facts were before the jury when it assessed Aldava's credibility. The defendant herein, as in *McMillan,* failed to show that the witness testified falsely. Although the defendant could show that Aldava was given favorable treatment after the defendant's trial, the mere fact, however, that charges against a State witness were reduced or dropped after trial does not, standing alone, raise an inference of prior favorable consideration. *People v. Sheridan,* 57 Ill. App. 3d 765, 775 (1978).

I would also note that all the case law cited by the defendant in this matter concerned instances where the witness was either an accomplice or a person to whom the defendant had allegedly made admissions. Here, Aldava testified as a victim. I believe that this distinction is important when weighing the impact of Aldava's testimony upon the jury.

Finally, I also disagree with the majority's characterization of Aldava's testimony as essential to the People's case. Aldava did not identify the defendant. While his testimony corroborated the testimony of other witnesses concerning the discharge of a firearm and the use of an incendiary device, I believe that Aldava's testimony was cumulative.

For the reasons indicated, I concur in part and dissent in part.