THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. OTIS WILLIAMS, a/k/a Odis Williams, Defendant-Appellant.

First District (5th Division)    No. 1—00—0477

Opinion filed June 28, 2002.

Michael J. Pelletier and Barbara C. Kamm, both of State Appellate Defender's Office, of Chicago, for appellant.

Richard A. Devine, State's Attorney, of Chicago (Renee Goldfarb, James E. Fitzgerald, and Nancy Colletti, Assistant State's Attorneys, of counsel), for the People.

JUSTICE GREIMAN delivered the opinion of the court:

Following a jury trial, defendant Otis Williams was convicted of first degree murder and aggravated battery with a firearm. He was sentenced to consecutive prison terms of 45 years and 10 years, respectively. On appeal, he makes the following contentions: (1) his conviction for aggravated battery must be reversed because there was no evidence to establish that the victim had been injured; (2) he was denied due process and a fair trial when the State's witness gave false testimony regarding a benefit he received in exchange for cooperation with authorities and the State failed to correct it; (3) irrelevant gang evidence was introduced which improperly suggested that defendant had engaged in other criminal conduct and the jury was improperly instructed with regard to that evidence; (4) the State made improper remarks during closing argument; (5) trial counsel was ineffective for

not presenting evidence that the witness was lying and failing to object to improper evidence and arguments; (6) the trial court erred in imposing a consecutive sentence where no severe bodily injury was established; and (7) his consecutive sentence is unconstitutional pursuant to the holding in *Apprendi v. New Jersey*, 530 U.S. 466, 147 L. Ed. 2d 435, 120 S. Ct. 2348 (2000). For the following reasons, the judgment of the circuit court is affirmed in part and reversed in part.

Defendant's conviction arose from the gang-related shooting of Gregory Sharp while seated in his car with Felicia Robinson, near the Dan Ryan Expressway in Chicago, on November 28, 1994. The shooting involved an internal struggle between leaders of the Gangster Disciples street gang.

Detective Christian Tito testified that at about 3:45 p.m. on November 28, 1994, she and her partner exited the Eisenhower Expressway at Kostner Avenue in response to a call about an accident. In the middle of the street, they saw a black car with a broken back window and bullet holes. They also observed bullet casings and broken glass on the ground on either side of the vehicle. There was a gray Pontiac with its rear window shot out, parked illegally next to the driver's side of the black car. Tito saw Sharp on the driver's side of the black car, lying on top of Robinson, who was on the passenger side of the car. Sharp had bullet wounds in his buttocks. Robinson was moaning and asking for help because she could not breathe. Tito and her partner moved Sharp's heavy body off of Robinson. Robinson was breathing normally when the ambulance arrived at the scene. When Sharp was taken from the car to the ambulance, several spent bullets fell from his body and clothing. Sharp subsequently died as a result of 17 gunshot wounds. Six bullets were recovered from his body.

Evidence technician Gorski collected the bullets and casings from the scene and examined the Pontiac. He noticed that the back window was shattered. There was a bullet lodged in the frame of the back window. The roof had three bullet-type holes in it, and the front windshield had a crack. Firearms examiner James Van Tilburg testified that he examined the various bullets, fragments and casings recovered in the shooting. He determined that 9-millimeter, .380 and .40-caliber S&W bullets were fired during the shooting. He was able to connect them to the bullet wounds on the victim.

Chicago police sergeant Joseph Gorman testified that there was a "take-down" of the Gangster Disciples street gang in 1995 and that at some point following the "take-down," various people came forward with information about the death of Gregory Sharp, including Delano Finch, his nephew Ramone Finch, and Kelly Quarles. Delano, Ramone and Quarles testified at trial that they were members of the gang

along with defendant and explained the hierarchy and rules. Their testimony established that the levels of the gang included Larry Hoover as the head, the board of directors, governors, regents, coordinators, and soldiers or outstanding members. They explained that the leaders in the gang had armed personal security to protect them or to secure areas from police interference with drug sales and from rival gang members' control. If a gang member violated the rules of silence and secrecy, he could be punished and killed. The main source of income for the gang was selling drugs.

Delano Finch testified that in November 1994, Darryl "Pops" Johnson and Gregory Sharp were board members in the gang. Delano was a governor at the time, and defendant was a member of his personal security detail. According to Delano, a week before the murder, Johnson met with him at a restaurant, and in a conversation outside the restaurant, Johnson told him that they had to kill Sharp. Defendant was present for this conversation. Delano tried to contact Sharp that day, but Sharp never responded to his call.

On November 28, 1994, Delano was paged again by Johnson and told to meet him at 87th Street and the Dan Ryan Expressway at a gas station. Delano then told his nephew Ramone and defendant to meet him at the station and to bring the .40-caliber gun. The gun had been given to Delano by Johnson. Delano testified that when he arrived at the gas station, defendant and several other members of the gang were present, including Ramone, Kelly Quarles, Antoine "Ug" Smith, Kevin Williams, Quan Ray, "Heavy," Cedric "Little Fool" Cato, and Mike "J." While at the gas station, Johnson spoke with Delano, Little Fool, Kevin Williams and Mike J. and told them to call Sharp, make him feel comfortable, and then kill him. After Johnson gave the order, Delano told defendant to get into his car because defendant was working security for Delano and had a gun, and told Ramone and Quarles to leave.

According to Delano, the gang members headed to the west side in different cars and exited the expressway at Kostner Avenue. Traffic was stopped all the way to the stoplight at the top of the exit ramp. Little Fool pulled his car alongside Delano's car on the ramp. He pointed out that Gregory Sharp was sitting with a woman in a black Mercedes about two to three cars ahead of them. Little Fool asked Delano if they should "do it" and Delano stated that he did not know. Little Fool then said "it's a go," and Kevin Williams went to the driver's side of Sharp's car with a 9-millimeter gun. Heavy jumped out with either a 9-millimeter or .380 gun and went to the passenger side of Sharp's car. Defendant jumped out of Delano's car with the .40-caliber gun and approached the Mercedes. According to Delano,

defendant was shooting at another car which appeared to have Sharp's security. When that car drove away, defendant started shooting at Sharp's car. After about a minute of gunfire, Delano told defendant to get back in the car, and they took off heading for the expressway. As they left, they drove alongside of Sharp's car and saw a woman slumped down and saw Sharp, who was slumped over the steering wheel, fall on top of the woman.

According to Ramone, on the day of the shooting, his uncle Delano paged him and told him to bring defendant to the gas station of the expressway on 87th Street and to make sure that defendant had a gun. When they arrived at the station, Delano told defendant to go with him and told Ramone and Quarles that they could leave. Delano stated that he did not want Quarles around because he had recently gotten out on bond on a federal case and was supposed to be cooperating with the authorities. Ramone testified that he followed Delano to the west side because he did not trust the people that were with Delano. Quarles was in the car with Ramone and testified that he did not know what they were planning to do and fell asleep in the car.

While he and Quarles were on the ramp exiting the expressway, they heard gunshots, Quarles woke up, and they both ducked down. When they looked up, Ramone saw K-dog, Quan, Heavy, and defendant. Ramone testified that he saw Heavy and Quan shooting on the passenger side of Sharp's car and defendant shooting from the trunk of Sharp's car into the back window. Quarles testified that he saw K-dog open the driver's side door of a dark Mercedes Benz or BMW and start shooting. He saw defendant next to the black car he had been driving in, shooting over the door of the car. Quarles also saw a "big dude" shooting from the passenger side of the dark car. After the gunfire stopped, they headed back toward the expressway and ended up back on the south side of Chicago.

Delano further testified that he was currently incarcerated, and had been since September 1995, when he was indicted for conspiring with other members of the gang to distribute narcotics and for other gang-related crimes. At that time, he was charged with about 50 counts in a drug conspiracy and faced a minimum sentence of life in prison. He stated that he entered into a written plea agreement with the government in which he promised to cooperate and testify truthfully in this case in exchange for a 15-year sentence. As part of the agreement, Delano admitted to his role in the murder of Sharp and testified at the trials of many other gang members.

Ramone further testified that he quit the gang in 1995 when the federal indictments were handed down against other members of the gang. He came forward about the Sharp murder in May 1996 because

someone had implicated him as a witness to the murder, and he testified the next month before the grand jury. It was stipulated by the parties that he signed a proffer letter, which he understood to mean that whatever he told authorities would not be used against him. Ramone additionally testified that in June of 1998, he pled guilty to armed robbery and home invasion for which he could have received a sentence of 6 to 30 years. He received an eight-year sentence for his cooperation with the authorities. As part of the State's agreement to recommend eight years, he had to testify against defendant in this case. He was incarcerated at the time of the trial.

Quarles further testified that prior to the murder in 1994, he was arrested in Missouri on drug charges and pled guilty to federal racketeering. The Sharp murder occurred while he was out on bond between his plea and the sentencing date. According to Quarles, after the shooting, he was sentenced to 60 months in prison on the racketeering plea. Subsequently, in May 1996, the Chicago police visited him in prison, wanting to discuss the Sharp murder. He told them what he knew and stated that no promises were made to him when he talked with authorities. He then went to Chicago and talked to other officers and attorneys at the United State's Attorney's office. He stated that there were no deals or promises offered to him in exchange for his testimony before the grand jury.

He testified that his lawyer on the drug case subsequently filed a motion to reduce his sentence in light of his cooperation with the authorities and his sentence was reduced to 17 months in October 1996. When defense counsel showed Quarles a letter dated September 27, 1996, from the United States Attorney's office in Illinois to the assistant United States Attorney in Missouri on his behalf, Quarles stated he had never seen the letter. When asked if the letter had anything to do with his reduced sentence, he responded, "I don't know. Like I told you, I ain't never seen that letter." When the defense counsel showed Quarles another letter dated May 22, 1996, from the United States Attorney's office in Illinois to the assistant United States Attorney in Missouri in regard to Quarles, he stated he did not know anything about that letter either. He denied making a deal with the United States Attorney to get out of prison early. The police told him that they could not make any promises regarding his sentence, and he merely agreed to talk to them about what he had seen. Quarles also testified that since being released from prison, he was convicted on another drug case and was sentenced to three years' probation. If he violated his probation, he would be sentenced to 52 months. He stated that he did not have any deal in that case either.

Gorman testified that on May 16, 1996, he and Ron Zitek, a federal

agent from the Department of Alcohol, Tobacco and Firearms, spoke to Quarles at the federal penitentiary in Minnesota. Gorman stated that neither he nor Zitek made any promises to Quarles prior to his telling them about his knowledge of the Sharp murder. As far as Gorman knew, there were no negotiations on Quarles' behalf. He was not aware that a week after he spoke with Quarles a letter was sent on Quarles' behalf.

At the conclusion of the trial, the jury found defendant guilty of first degree murder and aggravated battery with a firearm. The trial court sentenced defendant to 45 years in prison for the murder to be served consecutively to a 10-year sentence for the aggravated battery conviction.

■ Defendant initially contends that his conviction for aggravated battery with a firearm to Felicia Robinson must be reversed because there was no evidence presented to establish that Robinson had in fact been injured. The State concedes that the record fails to demonstrate that the element of injury was proven at trial. Both sides agree, and we find no testimony in the record to indicate that Robinson was injured. The State further concedes that a photograph of Robinson, which was introduced at trial but not made a part of the record on appeal, does not depict any injuries to her. Accordingly, defendant's conviction and sentence for aggravated battery with a firearm to Felicia Robinson must be vacated. Since his conviction and sentence on this crime cannot stand, we need not address defendant's arguments regarding consecutive sentencing as they are now moot.

■ Defendant next argues that his constitutional right to due process was violated at trial because Quarles falsely testified that he was not promised anything in exchange for his testimony against defendant and the State allowed the false testimony to go uncorrected. Although the issue was not raised by defendant during trial or in his posttrial motion, he argues that fundamental fairness warrants review of such a serious claim. The plain error rule allows the reviewing court to consider issues waived for purposes of review where the evidence at trial was closely balanced or the alleged error was so prejudicial that it denied the defendant a fair trial. *People v. Lucas*, 151 Ill. 2d 461, 482, 603 N.E.2d 460, 469 (1992). We consider defendant's arguments under the plain error rule, as the complained-of error involves defendant's constitutional right of due process.

■ In accord with the United States Supreme Court, Illinois has long recognized that a conviction based upon false testimony is contrary to fundamental principles of fairness. *Napue v. Illinois*, 360 U.S. 264, 3 L. Ed. 2d 1217, 79 S. Ct. 1173 (1959); *People v. Cihlar*, 111 Ill. 2d 212, 216-17, 489 N.E.2d 859 (1986). It is further well established

that the State's knowing use of perjured testimony to obtain a conviction constitutes a violation of due process of law and must be set aside if there is any reasonable likelihood that the false testimony could have affected the jury's verdict. *United States v. Bagley*, 473 U.S. 667, 678-80, 87 L. Ed. 2d 481, 492, 105 S. Ct. 3375, 3381-82 (1985); *People v. Barrow*, 195 Ill. 2d 506, 529-30, 749 N.E.2d 892, 907 (2001). The same principles apply when the State, while not soliciting the false testimony, permits it to go uncorrected when it occurs. *Barrow*, 195 Ill. 2d at 530, 749 N.E.2d at 907. It is equally applicable even where the witness's false testimony concerns only his or her credibility. *Barrow*, 195 Ill. 2d at 530, 749 N.E.2d at 907.

Defendant argues that Quarles falsely testified that he had no deal in exchange for his cooperation with authorities, when in fact the prosecution had affirmatively claimed that Quarles provided information in exchange for a reduced sentence. In support of his argument, he directs our attention to certain facts in the record. Prior to trial, defendant requested that the State disclose all information about the promises, inducements, or considerations given the prosecution witnesses who were to testify against defendant. In response, the State indicated that Quarles' plea agreement had been tendered to defense counsel. However, the plea agreement was never introduced at trial.

Additionally, during a pretrial conference, the prosecutor disclosed the following information to the court: "Kelly [Quarles] was a witness who came to us who was already in custody in the federal penitentiary. He provided information. In exchange for that provided information, the sentence on his case he was already serving time on was lowered in federal court, but there were never any other deals." Additionally, defendant directs our attention to the two letters sent by the United States Attorney on Quarles' behalf as indicating some sort of agreement in exchange for his cooperation. However, the contents of those letters were never introduced at trial.

At trial, Quarles denied providing information in exchange for a reduced sentence but, rather, testified that subsequent to his cooperation, his counsel obtained a reduced sentence on the crime for which he was already serving time. Thus, while he admitted that he ultimately received a benefit for his testimony against defendant, he claimed that there were no deals made in exchange for his testimony prior to his agreement to cooperate with the authorities. He further testified that he was unaware of any efforts made on behalf of the United States Attorney's office on his behalf. Defendant argues that this testimony led the jury to believe that there was no deal with the authorities for a sentence reduction, thereby misleading the jury and bolstering Quarles' credibility.

It is unclear from the facts before us whether defendant's claim is supported by the record, *i.e.*, if in fact Quarles had a deal with the authorities in exchange for his cooperation. Even assuming that a deal existed and the State failed to disclose it, we must determine whether there is any reasonable likelihood that the false testimony could have affected the jury's verdict in this case. This standard is equivalent to the harmless error standard. *People v. Olinger*, 176 Ill. 2d 326, 348, 680 N.E.2d 321, 333 (1997).

■ Unlike the cited cases of *People v. Jimerson*, 166 Ill. 2d 211, 652 N.E.2d 278 (1995), and *Olinger*, where the witnesses' testimony was critical to the State's case and the only evidence linking the defendants to the crimes, here, in contrast, there was other evidence of defendant's guilt. Here, Delano and Ramone Finch testified at length about defendant's participation in the murder. There was evidence that defendant was present when the murder was planned, that he was carrying a .40-caliber gun to the scene of the crime, and that defendant shot several times at Sharp's car. The jury was informed that .40-caliber casings were found at the scene. It was also informed that Delano and Ramone both received consideration in exchange for their cooperation, that they were fellow gang members, and that they were involved in the occurrence.

Moreover, unlike in *Jimerson* and *Olinger*, the jury was well aware that Quarles ultimately benefitted from his cooperation with the authorities by receiving a reduced sentence in exchange for his cooperation. It was also apprised of the letters written on Quarles' behalf from the United States Attorney after he spoke with authorities, that he was a gang member, and that he was present at the scene of the murder. Accordingly, the jury had sufficient information before it to adequately assess the credibility and reliability of Quarles' testimony. We conclude that the alleged uncorrected false testimony did not contribute to the jury's verdict. See *People v. McNeal*, 175 Ill. 2d 335, 355, 677 N.E.2d 841, 851 (1997).

■ ■ In a related argument, defendant asserts that his counsel was ineffective for failing to present available evidence to demonstrate that Quarles was lying when he testified that he did not receive a deal in exchange for his cooperation. To prevail on a claim of ineffective assistance of counsel, a defendant must establish that (1) trial counsel's performance fell below an objective standard of reasonableness, and (2) counsel's deficient performance so prejudiced the defendant that but for counsel's errors the outcome of the trial likely would have been different. *Strickland v. Washington*, 466 U.S. 668, 80 L. Ed. 2d 674, 104 S. Ct. 2052 (1984); *People v. Albanese*, 104 Ill. 2d 504, 473 N.E.2d 1246 (1984). The failure to satisfy either prong of the *Strick-*

*land* test precludes a finding of ineffective assistance of counsel. *People v. Patterson*, 192 Ill. 2d 93, 107, 735 N.E.2d 616 (2000). As stated previously, even assuming *arguendo* that Quarles was lying and that defense counsel could have demonstrated he was lying, it would not have affected the outcome of the case or undermined the fundamental fairness of the trial. Since we conclude that defendant suffered no prejudice, his claim of ineffective assistance of counsel on this point also fails.

We next address defendant's contention that irrelevant gang evidence and argument was elicited at trial which improperly suggested that defendant had engaged in other criminal conduct. Defendant acknowledges that some evidence of gang behavior was relevant in this case, a shooting of a fellow gang member. However, he argues that testimony regarding the gang's drug activity, his role as security, security's duty to protect high-ranking members and secure areas for drug sales from police and rival gang members, and that high-ranking gang members were involved in other crimes was not probative or relevant to Sharp's murder. Additionally, defendant argues that other closing arguments portrayed defendant as if he routinely committed murders on behalf of the gang.

Initially, the State maintains that defendant has waived consideration of these issues due to his failure to object at trial and raise them in a posttrial motion. Defendant requests that we review this issue to determine whether defense counsel was ineffective in failing to object to the allegedly improper evidence and arguments. Moreover, defendant contends that any error that occurred was plain error. We hold that, even if defendant had properly preserved these issues, he would not prevail.

■ Evidence of gang involvement in gang-related activity is relevant if it has a tendency to make the existence of a fact that is of consequence to the action more or less probable than it would be without the evidence. *People v. Gonzalez*, 142 Ill. 2d 481, 489, 568 N.E.2d 864, 867 (1991). It is generally held that gang-related activity is admissible to show common purpose or design, or to provide a motive for an otherwise inexplicable act where there is sufficient proof that the evidence is related to the crime charged. *People v. Smith*, 141 Ill. 2d 40, 58, 565 N.E.2d 900, 907 (1990). Relevant gang evidence is not excluded simply because it may have a tendency to prejudice the accused. *People v. Patterson*, 154 Ill. 2d 414, 458, 610 N.E.2d 16 (1992). A trial court's decision to admit such evidence will not be reversed absent a clear abuse of discretion. *People v. Colon*, 162 Ill. 2d 23, 30, 642 N.E.2d 118 (1994).

■ The testimony regarding the role of security within the gang

and defendant's position as security for Delano was relevant to establish a motive for the killing. Defendant's reliance on *People v. Lucas*, 151 Ill. 2d 461, 484, 603 N.E.2d 460 (1992), is misplaced. There, the defendant argued it was error to admit evidence that he was a member of the security force for a prison gang and that the qualifications for such a position included being loyal and physically capable of taking care of oneself in a physical encounter. The court held that such testimony amounted to evidence of defendant's character and that it was merely an effort by the State to portray the defendant as a person capable of murdering and persuade the jury that his propensity for violence made it likely that he was guilty. *Lucas*, 151 Ill. 2d at 484. Here, the testimony was not offered on defendant's character or to show a propensity to commit crime but, rather, to explain why defendant followed Delano's orders to shoot a high-ranking gang member and why he would be involved in an otherwise random and inexplicable shooting.

Evidence introduced by the State regarding gang involvement in drug sales was minimal and was not elicited to show defendant's propensity to commit crime. Nor do we find that the evidence and closing argument regarding other gang members and their crimes were presented to show that defendant had a propensity to commit crime. Rather, this evidence was introduced to establish the terms of Delano's plea agreement, to establish his credibility in testifying against other gang members, and to respond to the defense theory that only defendant was being singled out and other gang members involved in the shooting were not charged. Lastly, defendant argues that comments made by the prosecutor in closing argument portrayed defendant as if he routinely committed murders for the gang and was a "bad" person because he was a gang member. We do not condone the prosecutor's references to the gang causing "mayhem on the streets" and comment that because of drug selling, "shootings happen." However, we find that these comments were not reversible error.

■ Defendant also argues that the admission of Illinois Pattern Jury Instructions, Criminal, No. 3.14 (3d ed. 1995) (hereinafter IPI Criminal 3d No. 3.14) was an abuse of the court's discretion because it advised the jury that defendant had been involved in other criminal conduct besides that which was charged in the indictment where there was no evidence of criminal conduct by defendant other than that charged. Initially, we note that the instruction stated that defendant had been involved in "conduct" other than that charged in the indictment, instead of "offenses." The committee notes to the most recent version of IPI Criminal 3d No. 3.14 explain that the term "conduct" is to be used where defendant's actions are not technically an "offense."

See Illinois Pattern Jury Instructions, Criminal, No. 3.14, Committee Note, at 103 (4th ed. 2000).

The purpose of the limiting instruction was to avoid prejudice to defendant by limiting the purpose for which the' evidence of his "conduct" as a gang member could be used by the jury in reaching its verdict. There was evidence presented that defendant was security for Delano Finch, that security were armed with weapons, and that a week prior to the murder defendant was present when Johnson gave the orders to kill Sharp. It was for the jury to determine whether defendant engaged in this "other conduct" and, if so, what weight it should be given on the issue of intent, motive, and knowledge. Accordingly, the instruction was proper and operated to avoid prejudice to defendant.

Defendant next contends that he was denied a fair trial due to allegedly improper closing arguments that were not based upon the record, improperly vouched for the credibility of witnesses, and argued that an acquittal would be in violation of the jury's oath. Again, these arguments were not raised at trial or in a posttrial motion, but we have carefully considered the unpreserved remarks in light of defendant's ineffective assistance of counsel argument.

Initially, it must be noted that the defendant faces a substantial burden in attempting to achieve reversal based upon improper remarks made during closing argument. Although the prosecutor's remarks may sometimes exceed the bounds of proper comment, the verdict must not be disturbed unless it can be said that the remarks resulted in substantial prejudice to the accused such that, absent those remarks, the verdict would have been different. *People v. Pasch*, 152 Ill. 2d 133, 185, 604 N.E.2d 294 (1992). The regulation of the substance and style of the closing argument is within the trial court's discretion, and the trial court's determination of the propriety of the remarks will not be disturbed absent a clear abuse of discretion. *People v. Byron*, 164 Ill. 2d 279, 647 N.E.2d 946, 954 (1995).

Applying these principles to the present case, we find that the defendant's claims of error are largely without merit. Many of the allegedly inappropriate comments were invited by arguments of defense counsel, were based upon the evidence or legitimate inferences drawn from the evidence, or were allowable comments on the evils of crime and the fearless administration of justice. To the extent that comments may have exceeded the bounds of proper argument, we find that when the comments are taken in context of the closing argument as a whole, they did not result in substantial prejudice. Accordingly, we find no reversible error.

For the foregoing reasons, the judgment of the circuit court is affirmed in part and reversed in part.

Judgment affirmed in part; reversed in part.

CAMPBELL, P.J., concurs.

JUSTICE QUINN, specially concurring:
I agree with all of the holdings of the majority. I write separately to further address the issues which arise when the State provides benefits to its witnesses who have criminal charges pending or are under sentence. In addition to the cases cited by the majority, the defense also relied on the holdings in *People v. Nino*, 279 Ill. App. 3d 1027 (1996), and *People v. Diaz*, 297 Ill. App. 3d 362 (1998). Even more recently, in *People v. Ellis*, 315 Ill. App. 3d 1108 (2000), this court addressed the issue of what constitutes sufficient disclosure of benefits received by witnesses for the State who had criminal cases pending at some point during the time they were cooperating with the State. This court first pointed out that in several recent cases convictions had been reversed due to the lack of disclosure of such benefits. We then noted:

> "In none of these cases was the nature of the benefit the witness was to receive ever reduced to writing. This is not to imply that the State is endeavoring to hide the material fact of the benefit; rather, the failure to memorialize these benefits makes it much more likely that their existence would not be disclosed (whatever the motivation on the part of the prosecutors involved) and may encourage benefitting witnesses themselves later to mischaracterize what they were to receive in consideration for their testimony. The position the State finds itself in regarding these situations can be resolved in the future by the simple expedient of memorializing the benefit the witness is to receive and to reveal such circumstances with candor and alacrity." *People v. Ellis*, 315 Ill. App. 3d at 1117-18.

In the instant case, the State asserts (and the defense does not deny) that, prior to trial, the defense was tendered Kelly Quarles' federal plea agreements. Also during discovery, the State explained on the record that Quarles' federal sentence was reduced in exchange for information that he had provided. Quarles testified at trial that his federal sentence had been reduced because of his cooperation in this case and in a case in Missouri. Finally, during closing arguments, the State again advised the jurors that Quarles' federal sentence has been reduced after the court was notified of his cooperation in this case and the case in Missouri.

The State in this case complied with this court's holding in *Ellis* even though *Ellis* was decided months after this trial. The actions of the State in this case provide an excellent example of the conduct that the trial courts and courts of review should require of the State in other cases.

On March 1, 2001, Supreme Court Rule 412, Disclosure to Accused, was amended. See 188 Ill. 2d R. 412. The Special Supreme Court Committee on Capital Cases wrote the committee comments, which in pertinent part state: "Examples of information that clearly tends to be exculpatory or mitigating include: *** information concerning promises or expectations of leniency for a State witness ***." 188 Ill. 2d R. 412, Committee Comments, at lxvii. This language demonstrates that the committee recognized the importance of this issue and clarified the State's duty to disclose such benefits. I believe that the actions of the State in the instant case clearly comply with the dictates of amended Supreme Court Rule 412.

The defense, both at trial and on appeal, argues strongly that Quarles' testimony that his sentence reduction was not due to a "deal" or an "agreement" is false and is sufficient grounds to reverse defendant's conviction. The facts of this case amply demonstrate that the State fully complied with its duty to disclose and that the jury was fully apprised of the basis for the defense contention that Quarles had a motive to lie.

This may not be true in other cases. I am especially concerned about those instances where a witness has a criminal case pending at the time he is testifying at trial. The most common scenario seen by this court involves the witness testifying that "no promises had been made" and there was no agreement as to the resolution or sentence (if any) in the witness's pending case. I believe that this factual situation is rife with the potential for abuse. As this court held in *Ellis*, "[w]hen the State intends to notify a judge who is to sentence a witness with a pending case of that witness' cooperation, such notification constitutes a benefit to the witness which must be disclosed." *People v. Ellis*, 315 Ill. App. 3d at 1117. I would go further and suggest that when the State informs the defense that "no promises have been made" regarding a witness's pending criminal case, the trial court should insist that the jury be informed that this language means that the witness's criminal case may be resolved in any way permissible under the law— the witness's charges may be nol-prossed by the State, they may be reduced by the State, the witness may be sentenced on any charge the State wishes to file, the witness may plead to the charges currently pending against him and receive whatever sentence is statutorily permitted, or the witness may go to trial with the same possible results

as above (with the substitution of a not guilty finding rather than a *nolle prosequi*). To allow a witness to testify that there are no "promises," "deals," or "agreements" as to criminal charges pending against him without explaining the import of that testimony does not advance the truth-seeking process; it hinders that process.

Finally, I disagree with the majority's criticism of the State's comments in closing argument that gangs cause "mayhem on the streets" and that "shootings happen" as a result of the sale of narcotics. The jury was given evidence that multiple gunmen shot the victim pursuant to the orders of a gang chieftain, inflicting 17 gunshot wounds. This shooting occurred while the victim was driving on a public street. The primary purpose of street gangs is to sell narcotics and this activity irrefutably leads to a large percentage of the murders committed in Chicago. Consequently, the State's comments were completely proper.