THE PEOPLE OF THE STATE OF ILLINOIS, Plaintiff-Appellee, v. MANUEL MORENO, Defendant-Appellant.

Fourth District No. 4—00—0972

Argued June 26, 2002.—Opinion filed September 4, 2002.

330

Daniel D. Yuhas and Robert N. Markfield (argued), both of State Appellate Defender's Office, of Springfield, for appellant.

John P. Schmidt, State's Attorney, of Springfield (Norbert J. Goetten, Robert J. Biderman, and Perry L. Miller (argued), all of State's Attorneys Appellate Prosecutor's Office, of counsel), for the People.

JUSTICE STEIGMANN delivered the opinion of the court:

In July 2000, a jury convicted defendant, Manuel Moreno, of cannabis trafficking (720 ILCS 550/5.1(a) (West 2000)) and manufacture or delivery of more than 5,000 grams of a controlled substance containing cannabis (720 ILCS 550/5(g) (West 2000)). The trial court later sentenced him to 13 years in prison for cannabis trafficking and 6 years in prison for manufacture or delivery of cannabis, with those sentences to run concurrently. The court also awarded defendant 219 days' credit for time served prior to sentencing and ordered him to pay a $25 Crime Stoppers fee.

Defendant appeals, arguing that (1) as a matter of law, he cannot

be guilty of cannabis trafficking because (a) that offense is "complete" when the cannabis enters Illinois, and (b) the State presented no evidence connecting him to the cannabis at, or prior to, that point in time; (2) the prosecutor misstated the law on accountability during rebuttal closing argument; (3) the State failed to prove him guilty beyond a reasonable doubt of manufacture or delivery of cannabis; (4) he is entitled to an additional day of sentencing credit; and (5) the trial court lacked authority to order him to pay $25 to Crime Stoppers. We affirm in part, vacate in part, and remand with directions.

## I. BACKGROUND

The evidence at defendant's July 2000 trial showed that in March 2000, the Oklahoma Highway Patrol informed the Illinois State Police that (1) in the course of a traffic stop, they had discovered approximately 450 pounds of cannabis stowed in a U-Haul truck en route to Springfield, Illinois; and (2) the couriers had agreed to cooperate in making a controlled delivery. Oklahoma authorities then transported the U-Haul, the cannabis, and the two couriers, Javier Chavez and Reuben Corona, to Illinois State Police headquarters in Springfield.

After interviewing Chavez and Corona, Illinois authorities rented two adjoining rooms at the Ramada Limited hotel (Ramada) on Toronto Road in Springfield. One room was used as the couriers' hotel room and the adjoining room was used by surveillance personnel. Audio and video recorders were placed in the couriers' room, and Chavez wore a microphone. The U-Haul containing the cannabis was parked in the Ramada parking lot and was equipped with an electronic "kill switch," which enabled the police to control whether it would run.

Illinois State Police trooper Michael Luster testified that at around 10 or 11 a.m. on March 22, 2000, Chavez called his contact in Texas and told him that he had arrived in Springfield and rented a room at the Ramada. Between 4:30 and 5 p.m., defendant and Manuel Leyva arrived at the hotel room. Luster observed the room via video monitor. After about 45 minutes of discussion, Chavez, Leyva, and defendant left the room and went to the U-Haul. Luster could not see what happened at the U-Haul, but he could hear that they were trying to start it. They then returned to the hotel room and decided that they would have to return with a different vehicle. Leyva and defendant then left together.

Later that evening, Luster saw Leyva return to the hotel room alone and instruct Chavez and Corona to unload the cannabis from the U-Haul into a Dodge Caravan (Caravan) that was parked next to

the U-Haul. After they loaded the Caravan, Chavez was to walk to a nearby McDonald's, at which point Leyva would have someone else drive the Caravan away. At some point, Corona left the room, ostensibly to get a Coke, and met with Luster, who gave him the key to the U-Haul.

After Chavez and Corona moved the cannabis, they went back inside the hotel and gave the Caravan keys to Luster. Luster instructed Chavez to go to McDonald's. Luster was then informed via radio that as Chavez walked toward McDonald's, Justin Moon approached and entered the Caravan. At that time, the arrest signal was given.

Springfield police detective George T. Bonnett testified that he was conducting surveillance outside the Ramada on March 22, 2000. He saw a black Mustang and a green Yukon arrive at approximately the same time. He saw the people in the Mustang (later identified as defendant and Leyva) get out of the car and talk "for a bit" with the people in the Yukon. Then defendant and Leyva went back to the Mustang and left the area.

Bonnett learned via police radio that both vehicles "went over to the Hardee[']s parking lot, met over there," and then the Mustang returned to the Ramada and the Yukon drove around the parking lot of the Ramada and the surrounding businesses.

Leland Grove police sergeant Mark Gleason testified that he was a member of the arrest team on March 22, 2000. He identified Michael Mohan as the driver of the Yukon and Moon as the passenger. About 45 minutes after the Mustang and the Yukon arrived at the Ramada, Gleason saw Chavez and Leyva try to start the U-Haul. He did not see defendant near the U-Haul.

Chavez testified that prior to March 22, 2000, he lived in El Paso, Texas. In March 2000, he made an agreement with a man identified in the record only as "Manny" pursuant to which Chavez would be "in charge" of getting 400 pounds of marijuana from El Paso to Springfield in exchange for $40,000. After Chavez and Manny made this agreement, Chavez called Corona, whom he had known for several years, and asked him to rent a U-Haul truck for him. Chavez and Corona picked up the U-Haul and met Leyva at an El Paso supermarket. Chavez turned the U-Haul over to Leyva and a couple other people who drove it away to load it. They returned the loaded U-Haul to Chavez, who left for Springfield with Corona and one other passenger, a female friend of Corona's.

In Oklahoma, police pulled the U-Haul over for a traffic violation and discovered the cannabis. Chavez and Corona agreed to cooperate with the police, and Chavez called his contact in Texas to explain that they were delayed in Oklahoma due to a mechanical problem with the

U-Haul. Oklahoma authorities then transported Chavez and Corona to Illinois State Police headquarters in Springfield. Chavez told Illinois police that he had been instructed to rent a hotel room and call his contact in Texas when he arrived in Springfield.

At around 11 a.m. on March 22, 2000, Chavez called his Texas contact from the Ramada and told him that they had arrived in Springfield. Several hours later, Leyva called Chavez and told him that he was on his way to the Ramada. When Leyva arrived at the hotel room, defendant was with him. Chavez and Leyva began discussing the delivery of the contents of the U-Haul. During the conversation, Chavez referred to the contents of the U-Haul as "mota," which is slang for cannabis. Chavez and Leyva disagreed on the amount Chavez was to be paid, and Leyva insisted that the amount agreed upon was $30,000. Leyva also was not satisfied with where the U-Haul was parked. Defendant was present during the entire conversation, which lasted under an hour. Corona left the room "from time to time."

While Leyva was there, Chavez went out to try to move the U-Haul. He returned to the room and told Leyva that it would not start. Leyva accused Chavez of being afraid to move the U-Haul, and they went outside together. After Leyva tried and failed to start the U-Haul, they returned to the room and discussed what to do. Chavez and Leyva ultimately agreed that they would get a "Caravan" and return after sundown to be less conspicuous. Chavez first testified that defendant was present during this conversation, but he later testified that he could not recall whether defendant was in the room after he and Leyva had tried to start the U-Haul.

A couple of hours later, Leyva returned to the hotel room, handed Chavez the keys to the Caravan, which was parked outside, and told him to transfer the contents of the U-Haul into the Caravan. Leyva also told Chavez that he would be at the McDonald's across the street when everything was ready. After retrieving the padlock for the U-Haul from the police, Chavez and Corona went out to the parking lot. Chavez arrived at the U-Haul before Corona. When Corona arrived, he was carrying "some drinks," and he told Chavez not to move anything because the police were at a nearby gas station.

After loading the Caravan, Chavez went into the hotel, gave the Caravan and U-Haul keys to the police, and walked to McDonald's. As he reached the dining area, "everybody was arrested."

Corona testified that on March 21, 2000, he used his father's credit card to rent a U-Haul truck with Chavez, who did not have a credit card. His testimony regarding what happened in El Paso and his cooperation with Oklahoma and Illinois police was largely consistent with that of other witnesses.

Corona further testified that Leyva and defendant arrived at the hotel room at around 4:30 p.m. When Leyva came into the room, he introduced defendant to Chavez and Corona but did not explain who he was. Discussions were primarily between Chavez and Leyva. They discussed whether "all the mota was there." Corona heard the word "mota" used a couple of times. The word "marijuana" was used "at least once." Chavez and Leyva argued about whether Chavez was to be paid $30,000 or $40,000. Corona was not present for the entire conversation because he left the room a few times to confer with the police officers in the next room.

At one point, Chavez gave Leyva the keys to the U-Haul, and Leyva attempted to start it. Defendant went with them to the U-Haul and looked under the hood. Back in the hotel room, they discussed how they would transport the cannabis, and Leyva and defendant then left to get another vehicle.

Later that evening, Leyva and defendant returned with the Caravan, and they both stopped at the hotel room before going to McDonald's. After they left, Corona left the hotel to get some chocolate milk from the convenience store, and on his way back to the hotel, defendant, who had walked back over from McDonald's, approached Corona and said, "Don't move the pot right now because there is a cop car right there," referring to a patrol car at the gas station. The patrol car pulled away about five minutes later, and Corona and Chavez transferred the cannabis from the U-Haul to the Caravan. After they loaded the Caravan, Corona saw Moon get behind the wheel of the Caravan, and the arrests began.

The jury heard audiotape recordings of the conversations recorded by Chavez' microphone and the recording devices planted in the hotel room. The jury also watched videotape of the hotel room. Because the recordings were primarily in Spanish, the jury was allowed to follow translated transcripts of the tapes while the tapes were played. Maria Velasco and Sofia Stanford prepared the translation. Velasco and Stanford both testified that in preparing the transcripts it was sometimes difficult to determine who was speaking. Stanford testified that she was responsible for the speaker identification in the transcripts and explained that after viewing the videotape to identify each individual's voice, she was able to distinguish the voices on the audiotapes. Where she could not identify the speaker she inserted a question mark instead of a name. Although the tapes were admitted in evidence, the transcripts were not allowed in the jury room. Chavez testified that he had reviewed the transcripts and noted that many statements were attributed to defendant that were not made by him.

The transcript of the recorded conversation that occurred in the

hotel room when Chavez, Corona, Leyva, and defendant were present is included in the record on appeal. That transcript shows that during the argument between Chavez and Leyva regarding how much Chavez was to be paid, Corona said "that in El Paso the other Manuel had said they were going to give us $40,000."

Defendant testified that on March 22, 2000, he was living in Beardstown with his wife, her brother, and her parents. He was scheduled to work at AutoZone at around 2 p.m. and had to drop his son off with his son's mother in Springfield. Before he left for Springfield, he received a phone call from Efraim Ebarra, a former coworker. Ebarra asked defendant to "help somebody translate on some things." Ebarra "said that he had a friend that—that was coming to Springfield that had some problems with the truck on the way up" and Ebarra's friend did not speak English. When asked if he was given any other instructions regarding helping Ebarra's friend, defendant replied, "He just asked me to help him give him a ride maybe if needed." Ebarra told defendant that the man's name was Manuel Leyva and that Leyva would meet him at the home of defendant's brother, Mike Moreno. Ebarra told defendant that he would be paid "somewhere in the vicinity of $10, $15 an hour maybe." At some point in the morning, defendant called in sick to work because he was not feeling well.

After defendant dropped off his son, he went to Mike's house, where he met Leyva for the first time. Leyva told him that he wanted defendant to take him to the Ramada. Leyva did not know his way around Springfield very well. They did not discuss what they would do at the Ramada, whether defendant would be paid, or whether defendant was a mechanic.

They left Mike's house in Leyva's black Mustang and proceeded to Mohan's house. When asked why, defendant testified, "He just said to ask him to translate I guess." When they arrived, Moon was also there. Defendant did not know either Moon or Mohan well, although he had gone to school with Mohan. Defendant translated a conversation in which Leyva told Moon and Mohan to follow them to the Ramada to help unload something. Defendant then drove Leyva (in Leyva's Mustang) to the Ramada, and Moon and Mohan followed in a green Yukon. Leyva and defendant did not converse much on the way to the Ramada. When they arrived, Leyva told Moon and Mohan to wait and asked defendant to go inside with him.

Leyva and defendant went to a room number that Leyva had written on a piece of paper. Leyva knocked a couple of times, but no one answered. Leyva tried to make a call on his cell phone but was unable to make a connection. They left the hotel and went to Hardee's so that Leyva could use a pay phone. Moon and Mohan also went to Hardee's.

Defendant was not present when Leyva made his phone call. After the call, Leyva asked defendant to take him back to the Ramada. They went back to a different room at the Ramada, Leyva knocked on the door, and they were let in.

Once inside the hotel room, defendant saw Corona and Chavez, whom he had never met before. Leyva did not introduce defendant to Corona, and Chavez and did not explain to defendant why defendant was there. Leyva started talking to Chavez. When asked what they talked about, defendant testified as follows:

"A. *** [T]hey were talking about 40 and 30 and 40 and 30 and something to do with the truck. I really—I was kind of paying attention but yet I wasn't. I was trying to figure out—

Q. Did the conversation strike you as odd?

A. Yes it did.

Q. Did it make any sense to you?

A. At times it did and times it didn't.

Q. What did you think they were talking about?

A. Furniture.

Q. Okay. And did it strike you as odd that they would have this weird discussion about furniture?

A. Not really. Not at the time.

Q. Okay. The—While they were having this discussion, did you say anything?

A. I might have said a couple of things.

Q. And what—what did you say when you said anything?

A. I told them to do whatever he was going to do so I could get out of the room.

*  *  *

Q. How did you feel at that point?

A. Mostly nervous really.

Q. Okay, why were you nervous?

A. It was just odd being in the hotel room with three other people and then discussing things that I wasn't understanding."

Defendant further testified that during the time he was in the room, he did not hear anyone mention the word "marijuana" or "mota." Defendant "had suspicion that something was going on. [He] wasn't for sure whether it would be marijuana or some kind of drug or something." After about 25 minutes, defendant, Leyva, and Chavez left the room. Because defendant felt "odd," he told Leyva he was going to sit in the Mustang and he did not "want to do whatever [Leyva] was doing." Leyva said "fine," and defendant waited in the Mustang for 20 to 25 minutes. During that time, he could "kind of hear" that Leyva and Chavez were trying to start a vehicle. Leyva then went to

the Mustang to get something, left, and returned 5 or 10 minutes later. Leyva said "that he needed a vehicle, a truck or van of some sort." Defendant told Leyva that he did not personally have a truck or a van but that his sister owned a van.

They then drove to Mike's house. There, defendant asked Amber Welinski (a friend of Mike's) if they could borrow her green Mazda because Leyva did not want to go back to the Ramada in the same car. Defendant admitted that he thought that was "odd." Defendant then testified as follows:

"Q. But you went ahead and asked her?

A. Well, there was four other people. There was three other guys with them.

Q. That were with Mr. Leyva?

A. When I pulled into the house, Mr. Leyva was there, and when I got out, exited my vehicle, there was Mr. Leyva and four other Hispanic males."

Defendant later testified that once they were at Moreno's house, he went along with Leyva's suggestions because he was "afraid [of] something maybe happening to [him] or something."

Moon and Mohan arrived about an hour later. After that, defendant called his sister and asked to borrow the Caravan. She agreed. Defendant and Leyva drove to defendant's sister's house in someone else's car, and Moon and Mohan took Welinski's Mazda. When they got there, defendant's sister gave him the key to the Caravan, and he drove it to the Ramada. At the Ramada, defendant got out of the Caravan, left the keys in the ignition, and told Leyva he did not want anything to do with what he was doing. He then walked over to McDonald's, where Moon and Mohan were already waiting. They did not discuss what was happening at the Ramada. About 10 minutes after defendant left Leyva at the Ramada, Leyva arrived at McDonald's. Defendant translated for Leyva when he asked Moon to drive the Caravan over to McDonald's. Moon walked over to the hotel, and everyone was arrested.

During cross-examination, defendant admitted that he used to own Mike's home, lived there "off and on," and received his mail there. He also admitted that (1) Leyva, Corona, and Chavez all spoke Spanish and there was no need for a translator in the hotel room; and (2) before defendant volunteered the information, Leyva did not know that defendant's sister had a minivan.

Welinski testified that on March 22, 2000, she was at Mike's house at around 5 p.m. When she arrived, Mike and "three other guys" were present. They were Mexicans who did not speak English, and she had never met them before. Later, defendant and Leyva arrived, and

shortly thereafter, Mohan and Moon arrived. Defendant asked Welinski if he could borrow her car, and she agreed.

Based on this evidence, the jury found defendant guilty, and the trial court later sentenced him as stated. This appeal followed.

## II. ANALYSIS

### A. Defendant's Cannabis Trafficking Conviction

Defendant first argues that as a matter of law, he cannot be guilty of cannabis trafficking because (1) that offense is complete when cannabis enters Illinois; and (2) the State presented no evidence connecting him to the cannabis at or before that point in time. We disagree.

■ Because the interpretation of a statute is a question of law, our review is *de novo*. *People v. Maggette*, 195 Ill. 2d 336, 348, 747 N.E.2d 339, 346 (2001). The cardinal rule of statutory interpretation requires us to ascertain and give effect to the intent of the legislature. The language of the statute itself is the best indicator of the legislature's intent and thus we look first to the language of the statute to determine its meaning. *Maggette*, 195 Ill. 2d at 348, 747 N.E.2d at 346.

■ Section 5.1(a) of the Cannabis Control Act (Act) defines the offense of cannabis trafficking as follows:

"Except for purposes authorized by this Act, any person who knowingly brings or causes to be brought into this State for the purpose of manufacture or delivery or with the intent to manufacture or deliver 2,500 grams or more of cannabis in this State or any other state or country is guilty of cannabis trafficking." 720 ILCS 550/5.1(a) (West 2000).

■ We reject defendant's contention that the offense of cannabis trafficking is absolutely complete when the cannabis crosses Illinois state lines. Rather, we hold that the delivery of cannabis to a recipient within Illinois is a contemplated part of the offense of cannabis trafficking.

To be clear, we recognize that delivery is not *required* to sustain a conviction for cannabis trafficking. If authorities apprehended cannabis couriers after they crossed state lines but before they reached their intended destination or transferred the cannabis to an intended recipient or distributor, they would still be guilty of cannabis trafficking under section 5.1(a) of the Act (720 ILCS 550/5.1(a) (West 2000)). However, when law enforcement authorities allow such a criminal endeavor to play out, the delivery to the intended recipient does not constitute a separate criminal offense. Rather, it constitutes the completion of the cannabis trafficking enterprise.

This construction of the cannabis trafficking statute reflects the legislative intent behind its enactment. Put bluntly, the evil the

legislature sought to address by enacting that statute was not preventing persons from entering Illinois with large quantities of cannabis and, once over the state line, dropping it in some garbage dump or culvert, never to be found or used by anyone. Instead, the legislature wanted to prohibit people from entering Illinois "with the intent to manufacture or deliver" (720 ILCS 550/5.1(a) (West 2000)) large quantities of cannabis and, in fact, delivering it, as occurred in the present case.

■ Resolution of this case requires that we further consider the interplay between the criminal accountability statute, section 5—2(c) of the Criminal Code of 1961 (Criminal Code) (720 ILCS 5/5—2(c) (West 2000)), and section 5.1(a) of the Act (720 ILCS 550/5.1(a) (West 2000)). Under section 5—2(c) of the Criminal Code, a person is legally accountable for the conduct of another if "[e]ither before or during the commission of an offense, and with the intent to promote or facilitate such commission, he solicits, aids, abets, agrees or attempts to aid, such other person in the planning or commission of the offense." 720 ILCS 5/5—2(c) (West 2000).

For the sake of analysis, consider the following hypothetical. An individual in El Paso (the loader) loads a large quantity of cannabis onto a truck bound for Springfield. Although the loader did not make any of the arrangements for the shipment, he knew he was loading cannabis, that it would be driven to Illinois, and that someone in Illinois would be receiving this shipment. Clearly, once the cannabis crossed the Illinois state line, the loader would be guilty of cannabis trafficking in Illinois under sections 5—2(c) of the Code and 5.1 of the Act even though he was at all times 1,000 miles away from this state. He would be guilty of that offense because, with the intent to facilitate its commission, he knowingly aided others in the commission of cannabis trafficking by assisting the shipper who caused the cannabis to be brought to Illinois.

Let us further assume that the truck is driven from El Paso to Springfield by a third individual (the driver). After the driver enters Illinois, he stops for lunch and then proceeds to Springfield, where the truck is unloaded by another individual (the off-loader). The off-loader knows he is unloading cannabis from outside Illinois but is doing it at the request of another (the recipient) and did not make any of the arrangements for the shipment or delivery. Under defendant's theory that the offense of cannabis trafficking is complete when the cannabis enters Illinois, the off-loader cannot be guilty of cannabis trafficking. We conclude that this is an absurd result and one not intended by the legislature. The reasonable result—and what we conclude the legislature intended—would be for the individual who knowingly and

intentionally assists in the *completion* of the criminal enterprise to be guilty, just as is the person who knowingly and intentionally assists at its inception.

■ We therefore hold that (1) the offense of cannabis trafficking can encompass the delivery of the cannabis; and (2) when the requirements of section 5—2(c) of the Criminal Code are otherwise satisfied, one who (with the intent to promote or facilitate the commission of cannabis trafficking) solicits, aids, abets, agrees, or attempts to aid another person in the commission of that offense *at any point in that enterprise*, including its delivery component, is guilty of cannabis trafficking.

■ In support of our conclusion that defendant is criminally accountable for cannabis trafficking under section 5—2(c) of the Criminal Code, we note again that the conversation in the Ramada Inn in which defendant either participated or was present contained Corona's statement "that in *El Paso* the other Manuel had said they were going to give us $40,000." (Emphasis added.) This statement shows that defendant either knew—or was chargeable with knowing— that the marijuana originated from out of state.

### B. The State's Closing Argument

Defendant next argues that the prosecutor misstated the law of accountability during rebuttal closing argument when he stated that defendant was accountable for the criminal acts Leyva committed prior to collaborating with defendant in Illinois. We disagree.

During rebuttal closing argument, the prosecutor stated, in pertinent part, as follows:

"I told you in opening statements the [d]efendant didn't do anything personally, he didn't drive it across state lines. He wasn't the one down in Texas. [Leyva] was the one down in Texas. He is accountable, he is responsible for [Leyva] because he is [Leyva's] accomplice. They are working together, consequently he is responsible for the things that [Leyva] has done.

\* \* \*

Since he's involved during the commission of the offense, he's responsible for the whole thing, just like every other defendant. That's the law. It's very simple. It's very simple. Simply look at the accountability statute. If the [d]efendant knowingly participated during the course of events, he's responsible for his codefendants.

In this case it's [Leyva]. [Leyva] is the person responsible for causing those drugs to be brought into Illinois.

\* \* \*

El Paso to Justin Moon, if the [d]efendant knowingly participates

during that time period, he's on the hook for what his accomplices do. That's what accountability law is all about."

■ Defendant concedes that by failing to raise a timely objection at trial, he has forfeited this issue on appeal. Nevertheless, he urges us to review it under the plain error rule, which allows for review of issues that are otherwise forfeited when either (1) the evidence is closely balanced; or (2) the error is so fundamental and of such magnitude that the defendant was denied a fair trial. *People v. Johnson*, 317 Ill. App. 3d 666, 668-69, 740 N.E.2d 457, 459 (2000), *appeal pending*, No. 90678.

■ In light of our previous conclusion—that one who, with the intent to promote or facilitate the commission of cannabis trafficking, aids another in the commission of any aspect of that criminal enterprise is also guilty of cannabis trafficking—we further conclude that the prosecutor's remarks in rebuttal were not error at all. As earlier stated, Leyva was still committing the offense of cannabis trafficking when he accepted delivery of the cannabis from Chavez and Corona. Thus, the prosecutor's inartful statement of the law of accountability did not unfairly prejudice defendant. See *People v. Terry*, 312 Ill. App. 3d 984, 993, 728 N.E.2d 669, 677 (2000) ("Improper remarks require reversal only if they substantially prejudice defendant").

## C. Defendant's Manufacture or Delivery of Cannabis Conviction

Defendant next argues that the State failed to prove him guilty beyond a reasonable doubt of manufacture or delivery of cannabis (720 ILCS 550/5(g) (West 2000)) because neither he, nor anyone for whom he was accountable, ever possessed the cannabis. Specifically, he contends that once the cannabis was confiscated in Oklahoma, it was in the possession and control of the police, not defendant's accomplices. We disagree.

■ This court will not set aside a criminal conviction on grounds of insufficient evidence unless "the proof is so improbable or unsatisfactory that there exists a reasonable doubt of the defendant's guilt." *Maggette*, 195 Ill. 2d at 353, 747 N.E.2d at 349. "[T]he relevant question is whether, after reviewing all of the evidence in the light most favorable to the prosecution, any rational fact finder could have found beyond a reasonable doubt the essential elements of the crime." *Maggette*, 195 Ill. 2d at 353, 747 N.E.2d at 349. It is the jury's responsibility to "determine the witnesses' credibility and the weight given to their testimony, to resolve conflicts in the evidence, and to draw reasonable inferences from the evidence." *People v. Ortiz*, 196 Ill. 2d 236, 259, 752 N.E.2d 410, 425 (2001).

■ Pursuant to section 5 of the Act, "[i]t is unlawful for any person knowingly to manufacture, deliver, or possess with intent to deliver, or manufacture, cannabis." 720 ILCS 550/5 (West 2000).

"To support a conviction for unlawful possession of cannabis, the State must prove that the defendant had knowledge of the substance and that it was under his immediate and exclusive control. [Citation.] Possession may either be actual or constructive. [Citation.] Constructive possession exists when there is no personal present dominion over the drugs, but there is an intent and a capacity to maintain control and dominion over them. [Citation.] Possession may be joint or shared and yet still be exclusive. [Citation.]" *People v. Wells*, 241 Ill. App. 3d 141, 145-46, 608 N.E.2d 578, 582-83 (1993).

■ Our review of the record shows that the State presented sufficient evidence of Leyva's possession of the cannabis. The State's evidence showed that (1) Leyva orchestrated the loading of the cannabis onto the U-Haul in El Paso; (2) Leyva was the intended recipient of the cannabis and was responsible for arranging the transfer of the cannabis from the Ramada to another location; and (3) Leyva attempted to drive the loaded U-Haul when it was parked at the Ramada. Although the cannabis was not always in Leyva's actual physical possession, the evidence clearly showed he had the "intent and capacity" to maintain control over it. The fact that law enforcement authorities also had the intent and capacity to maintain control over the cannabis does not negate Leyva's culpability. See *Wells*, 241 Ill. App. 3d at 146, 608 N.E.2d at 583 (possession may be joint or shared and still be exclusive).

The State also presented sufficient evidence of defendant's culpability as Leyva's accomplice. Pursuant to section 5—2(c) of the Code, defendant's conviction of manufacture or delivery of cannabis must be sustained if the State proved beyond a reasonable doubt that (1) defendant aided Leyva in the planning or commission of the offense either before or during Leyva's commission of the offense, and (2) defendant intended to promote or facilitate Leyva's commission of the offense. 720 ILCS 5/5—2(c) (West 2000). We emphasize that when, as here, we are confronted with a challenge to the sufficiency of the evidence, we need not accept all of the evidence that constitutes the defendant's innocent explanation. Rather, given the jury's guilty verdict, we look to the evidence in the record supporting that conclusion.

The evidence that defendant aided Leyva in possessing the cannabis is overwhelming. Thus, the only colorable challenge to the sufficiency of the evidence lies in the element of defendant's intent.

Evidence of criminal intent is not usually direct; rather, intent is proved circumstantially by inferences reasonably drawn from the circumstances of the defendant's conduct. *Maggette,* 195 Ill. 2d at 354, 747 N.E.2d at 349. While the record contains some conflicting evidence and defendant's denials, the following evidence was before the jury and serves sufficiently as a basis for its conclusion that defendant intentionally aided Leyva: (1) defendant drove Leyva to the Ramada and accompanied him to meet with Chavez and Corona; (2) there was no need for a translator in the hotel room; (3) Leyva and defendant reconnoitered with Mohan and Moon at Mike's home, which was also defendant's home "off and on"; (4) defendant asked Welinski if he could borrow her car; (5) defendant volunteered the use of his sister's Caravan; (6) defendant drove the Caravan back to the Ramada; and (7) defendant warned Corona not to unload the "pot" while a police car was parked nearby.

## D. Sentencing Credit

Defendant next argues that he is entitled to an additional day of sentencing credit under section 5—8—7(b) of the Unified Code of Corrections (730 ILCS 5/5—8—7(b) (West 2000)). The State concedes that defendant was in custody for 220 days prior to sentencing and that the trial court erroneously awarded him credit for only 219 days. We accept the State's concession and remand with instructions to amend the sentencing order to reflect one additional day of credit for time served prior to sentencing.

## E. Crime Stoppers Fee

Last, defendant argues that the trial court lacked the authority to order him to pay $25 to Crime Stoppers. Citing *People v. Beler,* 327 Ill. App. 3d 829, 837, 763 N.E.2d 925, 931 (2002), the State concedes that the court lacked such authority, and we accept the State's concession. Accordingly, that part of the court's sentencing order imposing the $25 fine for Crime Stoppers is void and set aside.

## III. CONCLUSION

For the reasons stated, we affirm in part, vacate in part, and remand with directions to modify the sentencing order as stated.

Affirmed in part and vacated in part; cause remanded with directions.

KNECHT and TURNER, JJ., concur.