Filed 9/15/08                    NO. 4-07-0647

IN THE APPELLATE COURT

OF ILLINOIS

FOURTH DISTRICT

| | | |
|---|---|---|
| THE PEOPLE OF THE STATE OF ILLINOIS, | ) | Appeal from |
|      Plaintiff-Appellee, | ) | Circuit Court of |
|      v. | ) | Vermilion County |
| KEVIN POTTER, | ) | No. 07CF153 |
|      Defendant-Appellant. | ) | |
| | ) | Honorable |
| | ) | Michael D. Clary, |
| | ) | Judge Presiding. |

_____

JUSTICE COOK delivered the opinion of the court:

On June 5, 2007, a jury found defendant, Kevin Potter, guilty on an accountability theory of (1) possession of anhydrous ammonia with intent to manufacture methamphetamine (720 ILCS 646/25(a) (West 2006)), (2) tampering with anhydrous ammonia equipment (720 ILCS 646/25(d)(1)(C) (West 2006)), and (3) possession of anhydrous ammonia in an unauthorized container (720 ILCS 646/25(c) (West 2006)).  The trial court sentenced Potter to four years' imprisonment for possession with intent to manufacture and two years' imprisonment on the remaining convictions, each sentence to be served concurrently.  Defendant appeals, arguing that he was deprived of a fair trial where the State permitted a witness to falsely testify that no plea agreement had been reached in exchange for her testimony.  We affirm.

I. BACKGROUND

A. Trial Evidence Concerning Underlying Crime

Three Tennessee residents were involved in the crime at issue: defendant (age 22), defendant's friend Randall Johnson (age 32), and Randall's live-in girlfriend Sarah Norman (age 38). Defendant and Randall had been friends for many years. Defendant knew that Randall had previously been incarcerated for manufacturing methamphetamine and had smoked methamphetamine with Randall in the past.

According to defendant, on February 25, 2007, defendant called Randall on the phone several times with no apparent purpose in mind. At first, Sarah tried to block defendant's calls. When defendant finally reached Randall, Randall told defendant he was going on a road trip to see some friends and purchase some marijuana. Defendant agreed to go with Randall but did not ask any questions regarding the details of the trip. Randall's girlfriend Sarah was upset by this plan and did not want Randall to use her car because he had previously crashed it. Sarah finally conceded to the trip but decided that if Randall was going to go, she would go as well to ensure the safety of her car.

Randall and Sarah picked defendant up at his home at approximately 11 p.m. Randall began driving toward Vermilion County, Illinois. Defendant testified that he did not really know where they were headed. Sarah testified that she was not certain they were headed to Vermilion County but that she had

taken a prior road trip with Randall to Vermilion County, on which occasion Sarah had stayed in a hotel while Randall stole anhydrous ammonia. During the seven-hour car ride, the group ingested methamphetamine and marijuana. Sarah testified that all three people used methamphetamine, whereas defendant testified that only Randall and Sarah used methamphetamine. Defendant testified he smoked only one joint of marijuana.

According to Sarah, when the group was about half-way to Danville, Vermilion County, Randall told the group that he intended to steal anhydrous ammonia from a "place" (i.e., Illiana Seed agricultural supply company) he had heard about through a friend. Randall said that he intended to sell the anhydrous ammonia for $200 to $500 per quart. According to Sarah, defendant reacted to Randall's anticipated profits by saying, "Oh, really?" Defendant denied that Randall ever broached the subject of stealing anhydrous ammonia during the trip.

When the group neared Danville, Randall pulled over at a Wal-Mart store and everyone went inside. Randall purchased a mask, a set of goggles, and plastic hosing. Defendant testified he did not notice that Randall purchased these items because he was busy playing a "claw machine game." Sometime after the trip to Wal-Mart, defendant took over the driving. Randall gave him directions on where to go. According to defendant, defendant did not know where they were headed and he did not ask.

The group reached Illiana Seed at 6:30 a.m. Illiana Seed is in a flat, rural, open area and has only a few buildings. Randall got out of the car carrying a duffel bag containing two small storage tanks. Randall told defendant to drive away and return in 5 or 10 minutes. According to defendant, defendant did not know what Randall was planning to do and he did not ask. Defendant also denied seeing the storage tanks contained in the duffle bag.

Meanwhile, Illiana Seed employees were beginning to arrive to work. Tom Kentner, the owner of Illiana Seed, testified that as he approached the facility he saw Sarah's car sitting nearby with a man in the driver's seat. Kentner was slightly suspicious because he did not recognize the car. Kentner then saw white vapor coming from the area of the property where Illiana Seed stored its anhydrous ammonia. Kentner drove to the area and saw that one of the tanks was leaking anhydrous ammonia. Kentner also noticed that someone had attached a hose to the tank's valve with duct tape and that a duffle bag containing two "frosted up" tanks was lying nearby. Finally, Kentner saw Randall curled up in a ball behind one of Illiana Seed's big tanks. Kentner pretended that he did not see Randall, walked over to his truck, and called the authorities on his cellular phone. Randall was subsequently arrested without incident. At the time of his apprehension, Randall was dressed in camouflage

and netting and smelled of ammonia.

When defendant and Sarah arrived back at Illiana Seed to pick Randall up, they saw Randall with his hands up against a squad car. Defendant turned around and started driving the other way. The police followed and turned on their lights. Defendant continued to drive at a rate of 55 to 65 miles per hour, though he did not swerve or accelerate. According to defendant, he called his mother on his cellular phone to ask what he should do. Defendant's mother told him to pull over and so he did.

B. Circumstances Surrounding Sarah's Alleged Plea Agreement

On February 26, 2007, the morning of the crime, Sarah provided the police with a statement. The content of that statement is not in the record. On March 6, 2007, however, Sarah filed an answer to the State's motion for discovery that indicated an intent to plead not guilty and to potentially assert the defense of lack of criminal intent.

On June 1, 2007, the trial court held a pretrial hearing for all three defendants. Robert McIntire represented both defendant and Randall. The judge asked Sarah's attorney, Mark Christoff, how he would like to proceed and Christoff answered, "Judge, we have an agreement." The State then added, "We'd like to present that later, next week." When the court suggested taking Randall's plea, the State said, "I'd just as soon have it done after the trial on [defendant]." The court

- 5 -

stated it would recall the case on June 4, 2007, for the trial of defendant and for Sarah and Randall's pleas.

On June 4, Randall pleaded guilty (and subsequently received seven years' imprisonment). The State requested that the trial court continue Sarah's plea hearing until after she testified at defendant's trial. Sarah was present when the State made this request.

At defendant's trial, defendant's attorney cross-examined Sarah as follows:

"DEFENSE: Now, you're charged in this case as well, right?

SARAH: Right.

* * *

DEFENSE: You are set for a plea tomorrow; is that right?

SARAH: Yes.

DEFENSE: And to your understanding, what are you supposed to get for this plea?

SARAH: I'm not for sure yet.

DEFENSE: So, you don't know what the plea is going to be?

SARAH: Right.

DEFENSE: But you're testifying here because of the fact that you do have a deal

- 6 -

to testify against--well, or testify in [defendant's] case; is that right?

SARAH: I've not been offered anything, if that's what you're asking.

DEFENSE: Well, you understand you don't have to testify, don't you?

SARAH: No.  I didn't know.

DEFENSE: Your lawyer didn't tell you that you had a [f]ifth[-a]mendment right against self-incrimination?

SARAH: No.  I thought I would have to testify.

DEFENSE: Who is your lawyer?

SARAH: Mark Christoff.

                    * * *

DEFENSE: Do you know if your lawyer's been offered anything he hasn't told you?

THE STATE: Objection, Your Honor.

THE COURT: Overruled.  The answer was no.

DEFENSE: You don't know what arrangement your lawyer and Mr. Young have, do you?

SARAH: No.

DEFENSE: But, essentially, you are tes-

tifying here to help yourself in your case; isn't that true?

SARAH: No.

* * *

DEFENSE: Has [your lawyer] recommended that you testify?

SARAH: No.

* * *

DEFENSE: Do you know if you are even pleading guilty or not tomorrow?

SARAH: I guess I am.

DEFENSE: Okay.  Well, do you know--is that your decision or someone else's?

SARAH: It's mine.  I want to go back home to my kids as soon as I can get this over with.

* * *

DEFENSE: And are you hoping that your testimony here today will help you get out of jail as soon as possible?

SARAH: No.  I know it won't."

And then, on redirect:

"THE STATE: *** With regards to what your attorney told you if you took the stand,

- 8 -

what were you to tell the court and the jury?

> SARAH: He just told me to tell the
> truth."

Later, defense counsel requested that the State disclose any plea discussions concerning Sarah. The trial court called Sarah's attorney Christoff to appear in court. The following exchange then took place outside the presence of the jury:

> "DEFENSE: *** As I understand it, after
> talking with [the State] and [Christoff], it
> was proposed by the State that [Sarah]
> testif[y] against [defendant]. Mr. Christoff
> hopes that his client having done so will
> result in some benefit for her. His hope is
> probation. He has not communicated any par-
> ticular or specific expectation along those
> lines to his client, because there hasn't
> been anything formally established. I think
> that's a fair statement. I believe he does
> think she knows that she does not have to
> testify and can choose to testify or not
> against [defendant]. Mr. Christoff can cor-
> rect me if I'm wrong.
>
> CHRISTOFF: That's all true, Judge.
> Nothing has been promised to myself or to

her.  The only request from the State was that she be interviewed and testify truthfully if called to do so.

* * *

DEFENSE: Well, Judge, what I'm asking be disclosed to the jury is that there have been negotiations between the State and [Sarah's] lawyer, and that [Sarah's] lawyer is hopeful of some benefit to his client even though *** nothing has been communicated of any promise to disposition.

* * *

THE STATE: Your Honor, I think we have to look at this one, it's what the witness knew at the time she took the stand.  She didn't have an agreement.  To her knowledge, she didn't have an agreement.  That goes to the interest, bias that she would have, and she can think what she wants, and testify to what she was testifying.  She testified truthfully that she did not have a deal.  There was no deal.  There was no agreement for testimony.  The conversations I had with her attorney, Mr. Christoff, he did not even

relay those to her. She was told to get up on the stand and testify truthfully. My conversations with Mr. Christoff certainly weren't something that she was aware of, so that certainly can't come into her testifying with regards to bias. My conversation with Mr. Christoff, there wasn't a deal. She testifies, she testifies truthfully, we'll see.

* * *

CHRISTOFF: The reason *** I allowed her to testify without the benefit of an agreement or bargain is because no matter what happens today, if I don't get the plea agreement I'm seeking with [the State], I still have the option and am prepared to say ready for trial, because one of the defenses I plan to raise on behalf of [Sarah], if I need to, doesn't have anything to do with the codefendants in this case. *** I told her I recommended that she do it because I didn't think giving truthful testimony would ever hurt her. But there has been nothing promised as a matter of fact.

- 11 -

* * *

THE COURT: *** I don't see that anything [Sarah] has said is at odds with what counsel's told me so far has happened in her case. *** [Y]ou are wanting me now to also somehow submit to the jury that there has been some negotiation between the State and the defense, but there's no agreement reached?

DEFENSE: Yes, Judge.

THE COURT: How is that impacting anything?

DEFENSE: I think, Judge, that it would [imply] to the jury *** with the dots they can connect that essentially there is quid pro quo. The quid is just being withheld until the pro quo is given.

THE COURT: So what is it? What's the quid pro quo?

DEFENSE: Leniency in exchange for the testimony."

The parties finally agreed that the trial court would stipulate to the jury that there had been plea negotiations between the State and Christoff, but no agreement was reached.

- 12 -

In closing, the defense stated the following regarding Sarah's potential bias:

"Who would know better than a fellow criminal about what [defendant] as a criminal supposedly did?  Or you could say, as I suggested, hey, [Sarah's] got something at stake here too. *** Yeah, she hasn't been promised anything, but does that make it more or less likely that you would try to help out the person who is involved in your negotiations?"

The defense suggested that it would be human nature for Sarah to presume that testifying against defendant would help her get out of jail.  Additionally, the defense stated that, given that Sarah was represented by an attorney, her testimony that she did not know she had a fifth-amendment right not to testify was incredible.  The jury found defendant guilty as stated.

On June 6, 2007, the day after she testified at defendant's trial, Sarah pleaded guilty to attempt (possession of methamphetamine).  In exchange, the State agreed to request first-offender probation and drop the remaining charges, which were the same charges for which defendant had been convicted.  Christoff informed the trial court that the plea agreement had been reached that day over lunch.  Christoff, noting that Sarah had already served five months in jail and had testified truth-

fully in defendant's trial, then requested that the court reduce Sarah's bond from $500,000 (10%) to $50,000 (10%). The court went beyond that request and reduced Sarah's bond to $20,000 (10%). At a subsequent sentencing hearing, the court sentenced Sarah to probation.

On July 25, 2007, the trial court held a hearing on defendant's motion for a new trial. Defendant argued that the proceedings and circumstances surrounding Sarah's plea deal indicated that there had been at a minimum a "tacit understanding" between Sarah's attorney Christoff and the State at the time of defendant's trial. The court denied defendant's motion. The court indicated it did not believe there had been an agreement between Christoff and the State. In any case, the court noted there was a lack of prejudice because Sarah's testimony did not differ greatly from defendant's and because circumstantial evidence other than Sarah's testimony also implicated defendant. The court sentenced defendant as stated. This appeal followed.

## II. ANALYSIS

Defendant argues that he was deprived of a fair trial because the State permitted Sarah to falsely testify that no plea agreement had been reached in exchange for her testimony. In support of his assertion that a plea agreement did in fact exist, defendant notes that the week before defendant's trial, attorney Christoff indicated that he had an agreement with the State

regarding Sarah's plea, and the State indicated it would like to wait until after defendant's trial before the court entered any pleas as to either Sarah or Randall. However, during defendant's trial and outside the presence of the jury, Christoff denied that an official agreement existed, claimed he only "hoped" Sarah would receive probation in exchange for her testimony, and told the court that he recommended that Sarah testify simply because there would be no harm in testifying truthfully. Defendant argues that this statement rings hollow because, clearly, Sarah did incriminate herself by her testimony. Moreover, the State, in its representations to the court, seemed to evade the question of whether an agreement actually existed, stating, "To her knowledge, she didn't have an agreement. *** My conversations with Mr. Christoff certainly weren't something that she was aware of. *** She testifies, she testifies truthfully, we'll see." Finally, at Sarah's plea hearing held the day after she testified at defendant's trial, Christoff and the State told the court that Sarah had testified truthfully in defendant's trial, and the State recommended probation, which the court ultimately granted. Additionally, the State amended Sarah's possession charge to the lesser offense of attempt and dismissed the remaining two charges.

A conviction obtained by the use of false evidence, known to be such by representatives of the State, violates a

defendant's due-process rights. Napue v. Illinois, 360 U.S. 264, 269, 3 L. Ed. 2d 1217, 1221, 79 S. Ct. 1173, 1177 (1959). If false evidence is introduced to the jury, the State is required to correct it, whether the State solicited the false evidence or not. Napue, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177. This principle holds true even if the false evidence does not directly implicate the defendant, but instead speaks to witness credibility. Napue, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177. "The jury's estimate of the truthfulness and reliability of a given witness may well be determinative of guilt or innocence." Napue, 360 U.S. at 269, 3 L. Ed. 2d at 1221, 79 S. Ct. at 1177.

The motivation that a given witness may have for testifying against a defendant, such as the hope or promise of leniency in his own pending case, is relevant to the jury's determination of that witness's credibility. The State does not have an affirmative duty to disclose promises of leniency in exchange for witness testimony. People v. Pecoraro, 175 Ill. 2d 294, 313, 677 N.E.2d 875, 885 (1997). At the same time, if a witness falsely testifies that the State has made no promises of leniency, the State must correct the falsity. See People v. Ellis, 315 Ill. App. 3d 1108, 1114, 735 N.E.2d 736, 742 (2000). The agreement between the State and the testifying witness need not be a formal contract, as "'due process of law cannot hinge

upon such "gossamer distinctions."'" Ellis, 315 Ill. App. 3d at 1114-15, 735 N.E.2d at 742, quoting People v. Jimerson, 166 Ill. 2d 211, 227, 652 N.E.2d 278, 286 (1995), quoting People v. McKinney, 31 Ill. 2d 246, 250, 201 N.E.2d 431, 433. Instead, the witness simply must have reached an understanding with the State that he would receive a distinct benefit by testifying against the defendant. Ellis, 315 Ill. App. 3d at 1114, 735 N.E.2d at 742. The State should not allow the jury to be misled regarding the leverage that the State may have had over the testifying witness. People v. McMillan, 239 Ill. App. 3d 467, 493, 607 N.E.2d 585, 603 (1993).

The question of whether some sort of an agreement between the State and the witness existed is one of fact. See, for example, People v. Griffin, 109 Ill. 2d 293, 308, 487 N.E.2d 599, 605 (1985); People v. Bassett, 56 Ill. 2d 285, 293, 307 N.E.2d 359, 364 (1974). A bargain may be inferred from such circumstances such as the timing of the defendant's trial in relation to the witness's plea hearing and actual results of leniency at the witness's hearing. See Ellis, 315 Ill. App. 3d at 1114, 735 N.E.2d at 742. However, more than just a positive result for the testifying witness is needed to infer that a deal existed. People v. Harris, 55 Ill. 2d 15, 17, 302 N.E.2d 1, 2-3 (1973).

In People v. Nino, 279 Ill. App. 3d 1027, 1034, 665

- 17 -

N.E.2d 847, 852 (1996), the court found that the State improperly misled the jury regarding its dealings with witness Aldava. There, Aldava testified at the defendant's murder trial that he (Aldava) was currently in custody for residential burglary and arson and could potentially be sentenced to 15 years' imprisonment. Nino, 279 Ill. App. 3d at 1035, 665 N.E.2d at 852. The following exchange then took place:

> "'[DEFENSE:] You're kind of hoping the State is going to give you a deal if they haven't already, is that correct?
>
> [ALDAVA:] No. They ain't give me no deal.
>
> [DEFENSE:] Are you kind of hoping that they do?
>
> [ALDAVA:] Hope, hoping.
>
> [DEFENSE:] Hoping.
>
> [ALDAVA:] But I know I'm not going to get it.
>
> [DEFENSE:] You know you're not going to get it?
>
> [ALDAVA:] Correct.
>
> [DEFENSE:] Is there a reason why your case has been continued about three times until after you testify in this case before

- 18 -

it's disposed of?

    [ALDAVA:] No.

    [DEFENSE:] If you're not going to get a
deal, why don't you just set the case for
trial or your lawyer set the case for trial?

    [ALDAVA:] I don't know.

    [DEFENSE:] He doesn't tell you why?

    [ALDAVA:] Nope.'" Nino, 279 Ill. App.
3d at 1035-36, 665 N.E.2d at 853.

The day after the jury found the defendant guilty, Aldava's pending cases were disposed of pursuant to a negotiated disposition. Aldava's attorney admitted that, prior to the defendant's trial, he had preliminary discussions with the State regarding Aldava's pending charges. The State would not dispose of Aldava's case until after the defendant's trial. The State later testified this had nothing to do with Aldava's disposition, but "'had everything to do with the fact that he couldn't be a convicted felon at the time he testified, which is another form of impeachment.'" (Emphasis omitted.) Nino, 279 Ill. App. 3d at 1036, 665 N.E.2d at 853. Under these circumstances, the court determined that the State purposefully manipulated the timing of Aldava's pending cases, thereby allowing Aldava's testimony to appear in a misleading light and thereby preventing Aldava's credibility from being impeached before the jury. Nino, 279 Ill.

App. 3d at 1037, 665 N.E.2d at 853-54; compare McMillan, 239 Ill. App. 3d at 494, 607 N.E.2d at 604 (where the only evidence to suggest there had been an agreement was that after the witness testified in the defendant's case, the witness's murder charges were dropped, and the witness pleaded guilty to armed robbery).

The facts of the instant case bear strong similarity to the facts in Nino. Like the witness in Nino, Sarah gave the jury the impression that she was simply testifying in the interest of truth and justice by stating that she "knew" her testimony would not help her get any preferential treatment and that her attorney gave her minimal advice as to whether she should testify. However, also like the witness in Nino, Sarah's case was essentially disposed of the day after she testified in defendant's trial, and the record indicated that the timing of Sarah's disposition had been manipulated so that she could not be impeached on the stand. Moreover, in this case, Sarah's counsel indicated to the court a few days before defendant's trial that Sarah had an "agreement" with the State regarding Sarah's plea. The State did not deny this, but twice indicated that it would like Sarah's plea taken the following week, after defendant's trial. The circumstances of this case involve more than the coincidence of the testifying witness later receiving a lenient sentence.

One can infer from the circumstances of this case that

an agreement did in fact exist between Sarah's attorney and the State.  See Ellis, 315 Ill. App. 3d at 1114, 735 N.E.2d at 742 (an agreement need not be formal to be labeled as such so long as it is clear to the witness that he will be receiving a distinct benefit by testifying).  To tell the jury that Christoff and the State had negotiated without reaching agreement seems to mischaracterize what really happened.  Christoff and the State initially represented to the trial court that they had an agreement but that they would delay the agreement until after Sarah testified.  At defendant's trial, the State seemed to evade the question of whether an agreement existed by emphasizing that Sarah herself was not aware of any negotiations and by implying that whether any agreement would come to pass would depend upon whether Sarah testified truthfully.  Conditioning the activation of the agreement on Sarah's truthful testimony sounds like an agreement by any definition of the word.  Finally, immediately following defendant's trial, Sarah received a favorable disposition, indicating that Christoff and the State's initial representations to the court were accurate.  For the reasons stated, the trial court's finding that the jury was not misled as to the degree of leverage the State had over Sarah is against the manifest weight of the evidence.

There is also the question of whether it matters that Sarah herself knew of the agreement in order to find that the

State allowed Sarah's testimony to be presented in a misleading light. To highlight this issue, we point to the State's evasive representations to the trial court as to whether it had reached an agreement with Christoff: "To [Sarah's] knowledge, she didn't have an agreement. *** My conversations with Mr. Christoff certainly weren't something that she was aware of ***. She testifies, she testifies truthfully, we'll see." In dicta, our supreme court has indicated that where the attorney for the witness keeps the witness in the dark concerning the agreement with the State, the witness's representation to the jury that no agreement existed cannot be considered incredible or misleading. Griffin, 109 Ill. 2d at 308, 487 N.E.2d at 605. However, other jurisdictions have made findings to the contrary. In Hayes v. Brown, 399 F.3d 972, 980-81 (9th Cir. 2005), the court held that the State violated due process when it allowed a witness to deny that the State had offered to drop pending charges against him in exchange for his testimony even though the witness's testimony was not perjury because the witness had been deliberately kept uninformed of the agreement between his counsel and the State. The Hayes court reasoned that due process protects defendants from the knowing use of any false evidence by the State, and "that the witness was tricked into lying on the witness stand by the State does not *** insulate the State from conforming its conduct to the requirements of due process." Hayes, 399 F.3d at

- 22 -

981.  The court further noted that the witness's counsel may have influenced the content of the testimony, whether deliberately or not, and that the fact that the witness was not complicit in the falsehood gave it the ring of truth, thereby making the falsehood more dangerous, not less so.  Hayes, 399 F.3d at 981.  In any case, we note that Sarah was present at the pretrial hearing when the State specified that it wanted to wait until after she testified before it accepted her plea, so we have our doubts as to whether Sarah was completely uninformed as to the benefits she could receive in exchange for her testimony.

While it appears that the State allowed the jury to be misled as to the degree of leverage it had over Sarah, we cannot say the State's failure to correct the inaccuracy of Sarah's testimony regarding her plea agreement led to defendant's guilty verdict.  "A conviction obtained by the knowing use of perjured testimony must be set aside if there is [a] reasonable likelihood that the false testimony could have affected the jury's verdict."  People v. Olinger, 176 Ill. 2d 326, 349, 680 N.E.2d 321, 333 (1997).  Here, it is uncontested that defendant aided Randall in the commission of these offenses by driving the car to the anhydrous ammonia tanks.  The only question is whether defendant intended to do so.  Evidence establishing intent is usually circumstantial.  People v. Moreno, 334 Ill. App. 3d 329, 344, 778 N.E.2d 180, 191 (2002).  The evidence in this case overwhelmingly

indicates defendant's intent.

Defendant had known Randall for many years. By his own admission, he had used methamphetamine with Randall in the past and knew Randall manufactured methamphetamine. Defendant dropped Randall off at an industrial setting where anhydrous ammonia was being stored. Upon arriving to pick up Randall, defendant saw the police and attempted to flee the scene. Three police cars drove alongside defendant at 55 to 65 miles per hour with flashing lights before defendant finally pulled over. See People v. Johnson, 105 Ill. App. 2d 204, 206, 245 N.E.2d 85, 86 (1969) (evidence that the defendant fled from arrest is admissible to show guilt).

Additionally, defendant's alternative explanation is implausible. If a defendant chooses to give an explanation for an incriminating situation, "he should provide a reasonable story or be judged by its improbabilities." People v. Shevock, 335 Ill. App. 3d 1031, 1037-38, 782 N.E.2d 949, 954-55 (2003). Here, defendant expected the jury to believe that he decided to go on a seven-hour road trip in the middle of the night, without ever inquiring as to the final destination. Defendant apparently did not find it odd to drive seven hours to purchase marijuana from a friend. Defendant further expected the jury to believe that he did not notice or inquire into Randall's curious Wal-Mart purchases, which included a mask, a set of goggles, and rubber

- 24 -

hosing.  Defendant also failed to inquire as to why he was being instructed to drop Randall off in a field with a large duffle bag concealing two empty tanks near a facility that stored farming supplies such as anhydrous ammonia and to return in 5 to 10 minutes.

Because we find the evidence against defendant overwhelming independent of Sarah's testimony, we choose not to address defendant's alternative argument that the trial court erred in not informing jurors that Sarah's attorney "hoped" for a sentence of probation based upon his negotiations with the State.

## III. CONCLUSION

For the aforementioned reasons, we affirm the trial court's judgment.  As part of our judgment, we grant the State its statutory assessment of $50 against defendant as costs of this appeal.

Affirmed.

KNECHT and STEIGMANN, JJ., concur.

- 25 -